STATE of Wisconsin, Plaintiff-Respondent,

v.

Shirlene DAVIS, Defendant-Appellant.

Court of Appeals

*No. 99–2537–CR. Submitted on briefs June 15, 2000.—Decided November 6, 2000.*

2000 WI App 270

(Also reported in 622 N.W.2d 1.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Paul G. Bonneson* of *Law Offices of Paul G. Bonneson,* of Wauwatosa.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *David H. Perlman*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. FINE, J. Shirlene Davis appeals from judgments entered on her no-contest pleas convicting her of the unlawful delivery of heroin, *see* WIS. STAT. § 961.41(1)(d)1, maintaining a drug-trafficking place, *see* WIS. STAT. § 961.42, the unlawful possession of tetrahydrocannabinol, *see* § 961.41(3g)(e), and the possession with intent to deliver cocaine, *see* § 961.41(1m)(cm)1. She claims that the trial court erred in denying her motion to suppress evidence seized as a result of a no-knock execution of a search warrant.[1] We affirm.

---

[1] A defendant may appeal from an order denying a motion to suppress evidence even though the judgment of conviction rests on a guilty plea. WIS. STAT. § 971.31(10)

## I.

¶ 2. A court commissioner in Milwaukee County issued a search warrant for heroin and related drug paraphernalia for the lower unit of a two-story house in Milwaukee where Davis lived. The warrant authorized police officers to enter the unit without first announcing their presence. A police detective's affidavit in support of the warrant averred that an informant had recently purchased heroin from a young woman on the porch of the house.

¶ 3. In support of the no-knock aspect of the warrant, the detective's supporting affidavit averred, in its pre-printed portion, that "drug traffickers are frequently armed with weapons, [and] controlled substances are quickly and easily destroyed." Additionally, the detective hand-printed the following reasons specific to the residence for which the warrant was sought: "A large dog was observed on the porch with several lookouts. Affiant knows lookouts and dogs are used to warn the trafficker of the approach of police to provide time for the trafficker to destroy evidence, arm themselves, and/or escape." The detective's affidavit also averred that "an informant" had previously purchased heroin from a "male at the same residence." Davis concedes that the affidavit supported the warrant's authorization for a no-knock entry.

¶ 4. In the late afternoon of the day after the court commissioner issued the warrant, a police officer dressed in casual street clothes went to the house for which the warrant was issued to make an undercover drug buy and to get a lay of the land for the officers who were going to execute the warrant. Davis answered the door, and let him into a "little hallway section" in the front of the house. The undercover officer gave ten dollars to Davis, who, according to his testimony at the

17

suppression hearing, then "proceeded to walk down the hallway and turned left into an unknown room area." The officer also testified that although he did not see any weapons and neither saw nor heard any dogs, he "could hear at least three or four other people inside the room that [Davis] went into." He later told this to the officers who were going to execute the search warrant. Davis returned to the hallway with the heroin after ten or fifteen seconds. The undercover officer then asked for more heroin. He explained to the trial court that he "was trying to gain a little more time to see if I could hear any more or see anything else that could be helpful for the entry team after I had made the buy."

¶ 5. Officers executed the warrant minutes after the undercover officer reported his observations to them. The lead detective on the warrant-execution team testified that he decided to have the officers execute the warrant without knocking and announcing themselves even though the undercover officer did not see any lookouts and did not see or hear a dog, because the undercover officer stayed in the front hall area, and thus was "unable to eliminate the risk factors" of lookouts or the dog.

¶ 6. The lead detective told the trial court that several days before the warrant was executed, he had seen a man come out of the house that was the subject of the search warrant with "a rather large dog," which he described as being "about a little over knee height" and weighing approximately 120 pounds with the musculature of "a pit bull or a terrier of some sort." The man walked the dog down the block and then returned to the house with the dog. They both went back into the house, and the dog was tied up on the porch.

¶ 7. The lead detective noted that even though the undercover officer had not seen the dog, it "very

18

well could have been on the other side of the doorway inside the living room from where [the undercover officer] was standing." He also explained that although the lookouts were not outside the house when the undercover officer made his controlled purchases of heroin shortly before the warrant was executed, they could have been observing the street from the inside of the house. The lead detective told the trial court that heroin was "easy to destroy" because it is "a very light, powdery substance" with "a consistency of even lighter than talcum powder. If you were to put it in your hand and blow hard, it would form a cloud that—that would dissipate." He also testified that if heroin were put into water, "unless we catch the water before it goes down the drain, it's—it's impossible to recover."

¶ 8. As noted, the trial court denied Davis's motion to suppress. The trial court ruled that nothing the officers learned minutes before they executed the warrant negated their reasonable suspicion that by knocking and announcing their presence they would face possible danger from the dog, and the heroin would be destroyed before they could get to it.

## II.

¶ 9. Davis does not dispute any material part of the officers' testimony at the suppression hearing. Rather, she contends that based on that testimony the officers did not have the right to break into her house without first announcing their presence to give her a chance to voluntarily let them in. Her contention presents an issue of law that we resolve *de novo*. *See State v. Eason*, 2000 WI App 73 ¶ 3, 234 Wis. 2d 396, 398, 610 N.W.2d 208, 209 (application of facts to constitutional principles is subject to *de novo* review).

¶ 10. The general principle governing our decision is plain:

> In order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.

*Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). Irrespective of whether the search warrant authorizes a no-knock entry, the reasonableness of a no-knock entry is not determined at the time the warrant is issued but, rather, when it is executed. *Id.*, 520 U.S. at 395; *State v. Meyer*, 216 Wis. 2d 729, 753, 576 N.W.2d 260, 271 (1998). The State must show "particular facts" that "support an officer's reasonable suspicion that exigent circumstances exist" to justify a no-knock entry. *Id.*, 216 Wis. 2d at 751, 576 N.W.2d at 270. Whether law enforcement officers permissibly executed a search warrant by making a no-knock entry must be decided on a case-by-case basis. *Id.*, 216 Wis. 2d at 751, 753, 576 N.W.2d at 270, 271. The "reasonable suspicion" standard, however, "is not high." *Richards*, 520 U.S. at 394; *see also State v. Stevens*, 213 Wis. 2d 324, 331, 570 N.W.2d 593, 596 (Ct. App. 1997) ("[W]e agree with the United States Supreme Court that any burden placed on the police as a result of the particularized showing requirement is only a modest one."), *aff'd and remanded*, 217 Wis. 2d 369, 580 N.W.2d 688 (1998). The State has made the requisite showing here.

¶ 11.

*Richards* reversed *State v. Richards*, 201 Wis. 2d 845, 549 N.W.2d 218 (1996), which established a blanket rule permitting the no-knock execution of search

warrants in all felony drug cases. Recognizing that "while drug investigation frequently does pose special risks to officer safety and the preservation of evidence, not every drug investigation will pose these risks to a substantial degree," the Supreme Court in *Richards* gave examples where a no-knock entry would not be justified:

> For example, a search could be conducted at a time when the only individuals present in a residence have no connection with the drug activity and thus will be unlikely to threaten officers or destroy evidence. Or the police could know that the drugs being searched for were of a type or in a location that made them impossible to destroy quickly.

*Id.*, 520 U.S. at 393. Although these brief examples cannot, of course, exhaust the many possible variables, these are the core criteria against which any no-knock entry must be evaluated. The facts here satisfy these criteria.

¶ 12.　First, the officers could reasonably suspect that the other persons in the room entered by Davis when she went to get the heroin were either involved in or familiar with Davis's drug dealing; if they were not, it is unlikely that Davis would have kept in front of them what the ten- to fifteen-second interval indicates was an easily accessible stash of heroin. Second, just days before the execution of the search warrant, the lead detective had seen a large, pit-bull-type dog being brought out of and back into the house. Given that Davis had just sold two units of heroin to the undercover officer, it was not unreasonable for the detective to suspect that the dog was in the house, guarding the cache. Third, the detective explained how easily and

quickly heroin could be destroyed. None of these circumstances were negated by the undercover officer's observations from the front part of the hallway minutes before the officers executed the warrant; all make the officer's no-knock entry constitutionally valid. Accordingly, we affirm.[2]

*By the Court.*—Judgments affirmed.

---

[2] In an alternative argument, the State urges that suppression would not be an appropriate remedy even if the officers should have first knocked on Davis's door and announced their presence. *See United States v. Ramirez*, 523 U.S. 65, 72 n.3 (1998) (recognizing that there must be a "causal relationship between [the no-knock entry] and the discovery [of the evidence sought to be suppressed] to warrant suppression of the evidence"). Our court, however, has held that the observation on that issue in *Ramirez* was *dictum*, and that suppression *is* the appropriate remedy if law enforcement officers unlawfully execute a warrant by making a no-knock entry when the circumstances do not justify it. *See State v. Eason*, 2000 WI App 73 ¶¶ 9–13, 234 Wis. 2d 396, 401–405, 610 N.W.2d 208, 211–213; *see also State v. Stevens*, 213 Wis. 2d 324, 332–337, 570 N.W.2d 593, 596–598 (Ct. App. 1997), *aff'd and remanded*, 217 Wis. 2d 369, 580 N.W.2d 688 (1998). We are bound by the published decisions of our court. *Cook v. Cook*, 208 Wis. 2d 166, 185–190, 560 N.W.2d 246, 254–256 (1997).