STATE of Wisconsin, Plaintiff-Appellant,

v.

Deshon C. MATTHEWS, Defendant-Respondent.†

Court of Appeals

*No. 2010AP1712–CR. Submitted on briefs April 7, 2011.*
*—Decided May 17, 2011.*

2011 WI App 92

(Also reported in 799 N.W.2d 911.)

† Petition for Review denied 9/13/11.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *J.B. Van Hollen*, attorney general, and *Christine A. Remington*, assistant attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Paul G. Bonneson*, Wauwatosa.

Before Fine, Kessler and Brennan, JJ.

¶ 1. FINE, J. The determinative issue on this appeal is whether police officers may, in order to find out what's "afoot," *see Terry v. Ohio*, 392 U.S. 1, 30 (1968), stop and question a person wearing a ski mask and hoodie they see late at night in a high-crime area near a woman who was walking away from the hooded and masked person and who appeared to be frightened. The circuit court held that they may not. On our *de novo* review of the circuit court's legal conclusions, we disagree. Accordingly, we reverse.

¶ 2. This is the State's appeal from the circuit court's order suppressing cocaine, marijuana, and pills the police found on Deshon C. Matthews. *See* WIS. STAT. § 974.05(1)(d)2 (State may appeal an order "[s]uppressing evidence."). There are no disputed material facts. Thus, our review of the circuit court's order is *de novo. See State v. Davis*, 2000 WI App 270, ¶ 9, 240 Wis. 2d 15, 19, 622 N.W.2d 1, 3 (matters of law and constitutional principles are decided by an appellate court *de novo*).

## I.

¶ 3. On the night of November 30, 2009, three Milwaukee police officers were patrolling what one of them described as a high-crime area: "Street robberies, gang related violence, gun violence, and drug dealing." At about a quarter past eleven that night, they saw a man whom they later identified as Matthews. It was twenty degrees. According to the testimony of one of the officers, Michael Lopez, Matthews "had a ski mask over his face standing at the corner. There was a female walking away from him who was looking over her shoulder." Matthews was also wearing a hoodie. All this raised a red flag. Lopez explained at the suppression hearing: "[I]t appeared to be unusual I guess maybe because of the mask, and his hoodie up, and her walking away looking back over her shoulder, and when she would turn back and look in our direction or the direction she was headed, it appeared that she had a worried look on her face."

¶ 4. Lopez described Matthews's ski mask as "normal," and said that it "covered his face below the eyes." According to Lopez, Matthews "had his hands in his pocket" [sic] when the police first saw him. The officers never saw anything in Matthews's hands once he took them out of his pockets. Lopez testified that he was suspicious because "I often know that people wear ski masks when they commit crimes out there so that it conceals their face."

¶ 5. The patrol car's driver stopped next to Matthews when Matthews was "in the middle of the intersection at 16th and Meinicke." The patrol car's siren and flashing lights were off. Lopez, who was in the front passenger seat, got out of the patrol car, and walked over to Matthews. "I asked him immediately, I said, hey,

458

are you going to rob somebody." Matthews replied "no and then he pulled down his mask." By this time, the other two officers had gotten out of the patrol car and walked over to Matthews. None of the officers had their guns drawn.

¶ 6. Lopez testified that he then "asked [Matthews] if I could have consent to search him." According to Lopez, Matthews said "yeah and he put his arms up." It was during this search that Lopez found the cocaine, marijuana, and pills, and they arrested Matthews.

¶ 7. As we have seen, the circuit court granted Matthews's motion to suppress the cocaine, marijuana, and pills. It ruled that although Matthews freely consented to the search, a ruling that Matthews does not dispute on this appeal, the police officers violated Matthews's rights by stopping him to ask whether he was intending to rob someone. As material, the circuit court found that the evidence at the suppression hearing established:

- That the area of Meinicke and 16th Street was "a high crime area.";

- "[A] marked squad with three officers pull[s] beside him.";

- "One officer exits the squad and asks, quote, 'Are you going to rob someone,' end quote.";

- "Two other officers exit the squad."

¶ 8. The circuit court opined that "[c]ommon sense tells us then and there the defendant was not free to leave or ignore officers' commands[,]" and that thus Matthews "was stopped when the squad pulled alongside him and Lopez asked if the defendant was planning

to rob someone." It ruled that the stop was unlawful. We set out the pertinent part of the circuit court's rationale:

> Matthews was not loitering near a house known to be vacant. He was on a street corner . . . . Officers saw no guns, drugs or contraband. They didn't give Matthews an opportunity to explain why he was in the area.[1] They didn't attempt to question the female that was in the vicinity. The officers had no tips or information from citizen witnesses. The female lodged no complaints about any wrongdoing.
>
> There are many aspects of this case that trouble this Court. Matthews is in a high crime area at 11:13 at night alone and having contact with a passing female. His contact with her and his reasons for being there may have been innocent. I have a hunch it wasn't innocent, particularly when you consider the amount and type of drugs found on his person.[2] But hunches don't work for this Court, and hunches don't work for the law enforcement. The ends do not justify the means.

## II.

¶ 9. For some reason not evident in the Record, the State's appeal, as phrased by its main brief, "only challenges" the circuit court's conclusion that the officers stopped Matthews, and "does not argue reasonable suspicion existed to justify a stop." We are not, of course bound by the State's concession. *See State v. Gomaz*,

---

[1] This is not entirely true because, as the circuit court found, Lopez asked Matthews whether he was preparing or intending "to rob someone."

[2] Of course, what the officers found *after* the stop would not support reasonable suspicion to *make* the stop.

141 Wis. 2d 302, 307, 414 N.W.2d 626, 629 (1987) (court need not accept State's retraction of legal argument); *Bergmann v. McCaughtry*, 211 Wis. 2d 1, 7, 564 N.W.2d 712, 714 (1997) (we are not bound by a party's concessions of law); *Fletcher v. Eagle River Mem'l Hosp., Inc.*, 156 Wis. 2d 165, 168, 456 N.W.2d 788, 790 (1990) (A party's "concession" "in respect to a matter of law," however, "is binding upon neither the parties nor upon any court."); *cf. State v. Conger*, 2010 WI 56, ¶ 24, 325 Wis. 2d 664, 684–685, 797 N.W.2d 341, 351 (Courts are not bound by the State's plea-bargained concessions.). A person is "stopped" under Fourth Amendment jurisprudence when the circumstances are such that, viewed objectively, a reasonable innocent person in the person's shoes would not feel free to walk away from the police. *State v. Williams*, 2002 WI 94, ¶ 23, 255 Wis. 2d 1, 13, 646 N.W.2d 834, 839–840. As the circuit court recognized, the circumstances here are at least problematic whether, as the State argues on appeal, that, objectively, a reasonable innocent person in Matthews's position would have felt he or she was free to disregard the three police officers who pulled up next to him in their marked patrol car and, in essence, asked why he was wearing a ski mask and hoodie. Assuming (but not deciding), as the circuit court concluded, and as the Dissent opines, that the officers did "stop" Matthews, the stop was clearly consistent with the Fourth Amendment.[3] Since we are assuming that the officers *did* stop Matthews, the Dissent's contention that the officers

---

[3] Although wrongly contending that we are bound by the State's abandonment of the argument that the officers lawfully stopped him, *see State v. Gomaz*, 141 Wis. 2d 302, 307, 414 N.W.2d 626, 629 (1987) (court need not accept State's retraction of legal argument), Matthews adopts the circuit court's analysis of that issue, which we have set out in Part I of this opinion.

stopped Matthews is immaterial to our analysis because we do not nay say any of the circuit court's "findings." We conclude, however, on our *de novo* analysis of the legal issue, that those findings did not, as a matter of law, support the circuit court's suppression order.

¶ 10. The circuit court's oral opinion recognized that the fount of Fourth Amendment jurisprudence as to whether police may lawfully stop a person to find out what is going on even though they do not have probable cause for an arrest is *Terry*, which, of course, concerned two aspects of police intrusion that was not supported by probable cause: (1) a stop; and (2) a frisk. *See id.*, 392 U.S. at 19–20, 23. Here, however, we are only concerned with a "stop"; Lopez's search of Matthews was, as the circuit court found, and as Matthews does not dispute, consensual. We thus turn to what Terry teaches about whether the officers' stop of Matthews was lawful.

¶ 11. Under Terry, courts must assess the following in determining whether a stop is lawful:

- there must be "articulable facts" evident in the Record
- that "taken together with rational inferences from those facts,"
- when viewed objectively, permit a law-enforcement officer to "reasonably" "conclude in light of his experience that criminal activity may be afoot."

*Id.*, 392 U.S. at 21–22, 30. This is true even if each of those acts may be "innocent in itself, but which taken together warranted further investigation." *Id.*, 392 U.S. at 22. That is what we have here: (1) a man in a high-crime area; (2) late at night; (3) wearing a ski mask that covers his face below his eyes; (4) wearing a

hoodie; (5) who had an ambiguous but "unusual"-appearing encounter with a woman walking by herself. Although it was not a mid-summer night, and Matthews may have worn the ski mask and hoodie to stay warm so that his choice of clothing was innocent, the police reasonably and based on their experience could objectively see that "further investigation" was "warranted" to ensure that "criminal activity" was *not* "afoot." Accordingly, we hold on our *de novo* review, that Officer Lopez and the other officers had, objectively, the requisite reasonable suspicion to ask Matthews what he was doing. Indeed, Terry teaches that this is what a concerned competent officer should do: "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Ibid.* For example, the defendant in *United States v. Sokolow*, 490 U.S. 1, 10 (1989), had argued that "the least intrusive means available to verify or dispel their suspicions that he was smuggling narcotics," would have been "simply approach[ing] and sp[eaking] with him, rather than forcibly detaining him." That is what the officers did here. Certainly, phrasing the inquiry as "hey, are you going to rob somebody" was neither off-the-wall nor coercive. Indeed, Matthews replied "no," and was not forcibly detained until he was arrested following the consensual search. Since no one contends that Lopez's search of Matthews was not lawful, we reverse the circuit court's suppression order.[4]

*By the Court.*—Order reversed.

---

[4] As *Terry v. Ohio*, 392 U.S. 1 (1968) recognized, there was when Terry was decided, and, sadly, there still is, occasional police harassment of law-abiding citizens just trying to go about their lives without being hurt or hurting others. *Id.*, 392 U.S. at

¶ 12. KESSLER, J. (*dissenting*). The trial court, in a well-reasoned analysis of the facts and law, found that the State did not meet its burden of proving that the officers had a reasonable suspicion based on specific articulable facts and reasonable inferences therefrom that Matthews had committed, or was about to commit, a crime. After hearing all of the testimony and determining its weight, the trial court also found, based on the totality of the circumstances, that an investigative stop *did* occur and the stop was *not* "consistent with the Fourth Amendment." I accept all of the trial court's findings of fact because they are supported by the record; thus, I cannot join the Majority's disregard of the facts the trial court found or join the Majority's conclusions which are contrary to the trial court's analysis. *See* Majority, ¶ 9 (stop was consistent with Fourth Amendment); *see also* Majority, ¶ 11 (Matthews not seized until he was arrested after the search.).

¶ 13. In reviewing an order suppressing evidence, this court will uphold a trial court's findings of fact unless they are against the great weight and clear

14. "Yet," as Chief Justice Earl Warren tells us in *Terry*, "a rigid and unthinking application of the exclusionary rule, in futile protest against practices which it can never be used effectively to control, may exact a high toll in human injury and frustration of efforts to prevent crime." *Id.*, 392 U.S. at 15. That said, the exclusionary rules as they are applied to suppress evidence of crime do not help those who suffer unwarranted on-street indignities or harassment *unless* they are guilty; as Chief Justice Warren noted, the exclusionary rules give the innocent no recourse. The officers here did nothing wrong, and if other police officers in the future were encouraged by judicial decisions to ignore such obvious signs of potential trouble as the officers saw here, those decisions may very well exact what the Chief Justice called a "high toll" in human suffering. We commend the officers here for not just driving by, which, of course, would have been the easy thing for them to do.

preponderance of the evidence. *State v. Jackson*, 147 Wis. 2d 824, 829, 434 N.W.2d 386 (1989). A trial court's factual findings, including the weight to be given to those facts, may not be ignored by a reviewing court unless there is no evidence to support the findings. *See State v. Dixon*, 177 Wis. 2d 461, 466–67, 501 N.W.2d 442 (1993); *see also* WIS. STAT. § 805.17(2).[5] "The drawing of an inference on undisputed facts when more than one inference is possible is a finding of fact which is binding upon the appellate court." *State v. Friday*, 147 Wis. 2d 359, 370–71, 434 N.W.2d 85 (1989). "It is not within the province of . . . any appellate court to choose not to accept an inference drawn by a factfinder when the inference drawn is a reasonable one." *Id.* Whether a seizure or search has occurred, and, if so, whether it passes statutory and constitutional muster, are questions of law subject to *de novo* review. *Jackson*, 147 Wis. 2d at 829.

¶ 14. The Majority mentions only a few of the facts found by the trial court. *See* Majority, ¶ 7. A more detailed listing of facts found by the trial court is necessary to consider, as we must, the entirety of the articulable facts, and the inferences therefrom, known to the officers before they stopped Matthews:

> On the night of November 30, 2009 at 11:13 p.m., three officers, having respectively eleven, ten, and seven years of experience, were patrolling in a marked squad car in the 1600 block of W. Meinecke Avenue in Milwaukee, an area "known for violent crimes, gun activity, robberies and drugs."

> The officers saw a black male (later identified in court as Matthews) standing in front of 1635 W. Meinecke Avenue.

---

[5] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

One officer testified that "people loiter on street corners because that's where criminal activity occurs."

The temperature on that date and at that time was twenty degrees.

Matthews was wearing a ski mask that covered his face below his eyes, a hoodie on his head and had his hands in his pockets.

The officers also saw a black female walking a dog.

No officer observed any interaction between Matthews and the female. They heard no conversation, did not see Matthews grab or touch the female, and did not suggest by their testimony that the female was running from or fleeing Matthews.

The female walked by Matthews and looked twice over her shoulder at him.

The female was "50 feet or so" from Matthews when she looked back at him.

One officer testified that the female, when she was looking back at Matthews "had a nervous look on her face" while another officer believed the female "appeared as though she feared the [male]."

The officers made their observations during the twenty to thirty seconds that they continued to travel towards Matthews.

Matthews removed his hands from his pockets and walked in the direction of the female.[6]

The officer driving the squad stopped at a point in the intersection near Matthews.

---

[6] Matthews thus was walking west because the trial court described Matthews as walking in the direction of the female.

Matthews stopped when the squad stopped.

One officer got out of the squad and asked Matthews "Hey, are you going to rob somebody?"

Matthews replied "No" and pulled down his ski mask.

The officer who asked Matthews whether he was going to rob someone then asked if he could search Matthews, to which Matthews responded "Yeah" and raised his arms.

Matthews was not asked for identification.

¶ 15. The Majority cites portions of the officers' testimony not specifically discussed by the trial court. *See* Majority, ¶¶ 3–6. Additional undisputed evidence which the court heard, but did not specifically discuss, is material to the totality of the facts known to the officers before the stop:

The squad car was traveling eastbound from the 1700 block of Meinecke Avenue.

The woman was walking west on Meinecke Avenue.

Matthews walked west on Meinecke Avenue, which was towards the officers.[7]

One officer testified that the woman never stopped to talk to Matthews and never made eye contact with Matthews.

The squad car stopped in front of Matthews by "only a few feet."

The other two officers were "right behind" the first officer when he got out of the squad car.

---

[7] Thus, the record establishes without contradiction that both the unknown woman and Matthews were walking westbound on Meinecke Avenue, which was towards the eastbound squad car, also on Meinecke Avenue.

By [the time Matthews responded "no"], the other two officers were also out of the squad car.

One officer testified that her partner was "right next to" Matthews on his right, while she was next to Matthews on his left, and the officer driving had come around the squad car and was behind Matthews.

No officer asked Matthews to explain his reason for being on the sidewalk.

¶ 16. The case that established the constitutional limits of an investigative stop is *Terry v. Ohio*, 392 U.S. 1 (1968). It is important to renew our understanding of the facts in *Terry* which persuaded the Supreme Court to expand the constitutional case law relating to seizure of a person beyond the traditional limits of probable cause to arrest. The facts involved considerable investigation by the officer before he made the investigative stop.

¶ 17. The officer in *Terry* began with what was clearly no more than a hunch—two men he had never seen before, who "didn't look right" to the officer, were standing on a corner in the afternoon. *Id.* at 5. Instead of immediately confronting the men based on his hunch, the officer engaged in objective professional police work. *Id.* He took up an observation post "300 to 400 feet away from the two men" and began watching them. *Id.* at 5–6. He watched as the men, separately and alternately walked several times to one particular store while the other idled at the corner. *Id.* at 6. The walker looked in the window as though examining something inside, then returned to the corner and conferred with the other man. *Id.* At some point, a third man joined them, they all talked briefly, and the third man left. *Id.* The original two men continued their walking, peering and conferring for ten to twelve minutes. *Id.* In all, they

had examined the same window approximately a dozen times. *Id.* Then they left, taking the same route the third man had used earlier. *Id.* The officer by then was suspicious that the men were "casing a job," planning to rob the store. *Id.* The officer followed the men, saw them stop in front of another store and talk with the same man they had spoken with earlier. *Id.* At that point, the officer confronted the three men, identified himself as a police officer and asked for their names. *Id.* at 6–7. The two men "mumbled something" which led the officer to grab one, spin him around facing the other two, and pat down the outside of his clothing. *Id.* at 7. As a result of pat downs of all three men, the officer located a gun in the outer clothing of two of the men, who were then arrested for carrying concealed weapons. *Id.*

¶ 18. The Supreme Court concluded that even though the officer did not have probable cause to arrest the men until after the search, the officer's conduct, including his use of his training and experience, was constitutionally permissible under the Fourth Amendment. *Id.* at 20. The Supreme Court explained with respect to stopping the men that:

> [I]n justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.

*Id.* at 21. It further explained that the test must be an objective one, not solely dependent on the subjective opinion of the officer, and described how a reviewing court may determine whether the standard has been satisfied.

> [I]n making that assessment it is imperative that the facts be judged against an objective standard: would

the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.

*Id.* at 21–22 (citations and footnote omitted).

¶ 19. Whether a police contact is a "seizure" under the Fourth Amendment is also determined by an objective test. *United States v. Mendenhall*, 446 U.S. 544, 551 (1980).[8] "The Fourth Amendment's requirement that searches and seizures be founded *upon an objective justification* governs all seizures of the person, 'including seizures that involve only a brief detention short of traditional arrest.' " *Id.* (emphasis added; citation omitted). "[A] person is 'seized' only when, by means of physical force *or a show of authority,* his freedom of movement is restrained." *Id.* at 553 (emphasis added). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person

---

[8] In *United States v. Mendenhall*, 446 U.S. 544 (1980), a "permissible investigative stop" was based on a Drug Enforcement Administration agent's testimony that the respondent's behavior fit a "so-called 'drug courier profile.' " *Id.* at 547 n.1, 549. The agents found it relevant that:

> (1) the respondent was arriving on a flight from . . . a city believed by the agents to be the place of origin for much of the heroin brought to Detroit; (2) the respondent was the last person to leave the plane, "appeared to be very nervous," and "completely scanned the whole area where [the agents] were standing"; (3) after leaving the plane the respondent proceeded past the baggage area without claiming any luggage; and (4) the respondent changed airlines for her flight out of Detroit.

*Id.* at 547 n.1 (brackets in original).

would have believed that he was not free to leave." *Id.* at 554; *see also State v. Harris*, 206 Wis. 2d 243, 253, 557 N.W.2d 245 (1996) ("The Supreme Court has said that a seizure of the person occurs when an officer, by means of physical force *or a show of authority*, restrains a person's liberty.") (emphasis added).

¶ 20. The Wisconsin Supreme Court has consistently interpreted the search and seizure provision of the Wisconsin Constitution identically to the protections of the Fourth Amendment of the United States Constitution. *See State v. Dearborn*, 2010 WI 84, ¶ 14, 327 Wis. 2d 252, 786 N.W.2d 97. As our supreme court noted in *State v. Richardson*, 156 Wis. 2d 128, 139, 456 N.W.2d 830 (1990):

> To execute a valid investigatory stop, *Terry* and its progeny require that a law enforcement officer reasonably suspect, in light of his or her experience, that some kind of criminal activity has taken or is taking place. Such reasonable suspicion must be based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. These facts must be judged against an objective standard: would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate?

(Internal citations omitted; quotation marks omitted.)

¶ 21. Our supreme court approved an investigative stop in *Richardson* based on a very detailed anonymous tip about illegal drug trafficking. *Id.* at 132–34. After receiving the tip, the officer set up surveillance on the route the tipster told the officer the trafficker was expected to take. *Id.* at 134–35. The officers followed a car meeting the tip description occupied by a man who also met the tip description. *Id.* at 135. The car stopped

at an apartment building (as the tipster said it would) and the occupants went inside. *Id.* The officers kept the car and building under surveillance for about a half an hour until the occupants returned to the car and drove away. *Id.* The officers then made a traffic stop, although no traffic violations were observed, removed the occupants and searched the defendant. *Id.* Substantial police investigation corroborated otherwise innocent details of the tip, thus providing inferences from articulable facts which justified reasonable suspicion that a crime was being committed. The court approved the stop as satisfying the *Terry* requirements. *Richardson,* 156 Wis. 2d at 138, 143–44.

¶ 22. As our supreme court explained in *State v. Guzy,* 139 Wis. 2d 663, 675, 407 N.W.2d 548 (1987):

> Law enforcement officers may only infringe on [an] individual's interest to be free of a stop and detention if they have a suspicion grounded in specific, articulable facts and reasonable inferences from those facts, that the individual has committed a crime. An inchoate and unparticularized suspicion or "hunch" ... will not suffice.

(Internal citations omitted; one set of quotation marks omitted; ellipses in original.) *Guzy* provided guidance for both trial and reviewing courts that are required to determine whether there were specific articulable facts justifying an investigative stop by instructing courts to consider the following six factors:

> (1) the particularity of the description of the offender or the vehicle in which he fled;
>
> (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred;
>
> (3) the number of persons about in that area;

472

(4) the known or probable direction of the offender's flight;

(5) observed activity by the particular person stopped; and

(6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

*Id.* at 677. These factors seem designed for an investigative stop for which either the commission of a crime has been reported to officers, or for which officers observe a crime or preparation for a crime. *Guzy* involved a report of a robbery that had just occurred in Wisconsin at 2 a.m. and a description of a suspect with shoulder-length hair that two officers heard while transporting a prisoner. *Id.* at 666–67. The officers turned onto a particular highway and found themselves behind a truck with Minnesota license plates headed towards Minnesota and occupied by two men with long hair. *Id.* at 667. They followed the truck for thirty to forty seconds and discussed that the robbers could be in their particular vicinity given the time the robbers were reported leaving the scene of the crime. *Id.* They also noted that an occupant of the truck had hair fitting the description of the robber's hair length. *Id.* The truck was within two miles of the Minnesota border. *Id.* The officers stopped the truck to get a better look at the occupants. *Id.* Guzy matched the description of the suspect and was asked to step out of the truck. *Id.* at 668. The officer then saw a small brown paper bag in plain view. *Id.* The officer opened the bag looking for a gun, but found a large amount of money. *Id.*

¶ 23. Our supreme court approved the investigative stop. *Id.* at 678. It noted that the vehicle was in a location at a time consistent with the recent robbery

473

report, if the robbers fled in a vehicle. *Id.* at 681. The only feature initially linking the passenger to the robbery was his shoulder-length hair. *Id.* The court found that there were no alternative means of further investigation, and in the context of the recent robbery report, a minimal stop would allow officers to determine whether the occupant matched the physical description of the robber known to the officers. *Id.* at 678.

¶ 24. By contrast, our supreme court did not approve of the stop in *Harris*, where no pre-stop investigation occurred and where there were no exigent circumstances making further investigation impossible, as was the case in *Guzy*. In *Harris*, three men were parked in a car on a residential street at 11:30 p.m. *Id.*, 206 Wis. 2d at 246–47. They were in front of the home of a robbery suspect for whom police were searching. *Id.* at 246. The suspect was described only by height, weight and as "a young black male with very short hair." *Id.* The officers saw no one exit or enter the car and had "no idea" who or how many people were in the car. *Id.* at 247. When the car pulled away from the curb, police blocked the car, exited their squad car and approached the vehicle with at least one drawn gun. *Id.* The court concluded that:

> The only specific and articulable facts of the record before us, namely that a vehicle pulled away from the curb close to the robbery suspect's address, and that the vehicle contained several black males, do not amount to reasonable, articulable suspicion.
>
> . . . .
>
> Pulling away from a parked position at a curb on a residential street, even if close to the suspect's address, is not reasonably suspicious behavior. Three men in a car on a residential street at 11:30 at night is not reasonably suspicious behavior.

*Id.* at 262. The court concluded that "the seizure of Harris was without reasonable, articulable suspicion, and therefore violated his Fourth Amendment and art. I, sec. 11 rights." *Id.* at 263.

¶ 25. Similarly, in *State v. Washington*, 2005 WI App 123, 284 Wis. 2d 456, 700 N.W.2d 305, we held that an officer did not have reasonable suspicion that the defendant was involved in criminal activity and was therefore not justified in making a stop. In Washington, the officers investigated a vague complaint of loitering and drug sales at an allegedly vacant house. *Id.*, ¶¶ 2, 17. They observed Washington standing in front of the house the officers believed was vacant at about 3 p.m. *Id.*, ¶ 2. The neighborhood was a "high crime area." *Id.*, ¶ 7. After one of the officers recognized Washington from past encounters, Washington was ordered to stop, which he did initially. *Id.*, ¶ 2. Washington then took a few steps backward, "looked nervous" and threw his hands up, dropping a towel. *Id.* Officers then pushed Washington to the ground. *Id.* We affirmed the trial court in concluding the initial stop was unreasonable. *Id.*, ¶ 17. Specifically, we held:

> Investigating a vague complaint of loitering and observing Washington in the area near a house that the officer believed to be vacant, even taken in combination with the officer's past experiences with Washington and his knowledge of the area, does not supply the requisite reasonable suspicion for a valid investigatory stop. People, even convicted felons, have a right to walk down the street without being subjected to unjustified police stops.

*Id.* There was no evidence that the officers conducted any sort of investigation such as surveillance or observation of objectively suspicious activity, as was the case in *Terry*, before making the stop.

¶ 26. In the case at bar, the trial court heard all of the facts and found that Matthews was stopped by police. *See* Majority, ¶ 8. However, the Majority considered only some of the facts in the record when it reversed the trial court's conclusion. A barrage of facts support the trial court's finding that Matthews was stopped by a show of police authority before he was searched:

- Matthews was confronted with a squad car "a few feet" in front of him in the intersection.

- Almost immediately after the squad car stopped, there was an officer on either side of Matthews and another officer coming around from behind the squad car.

- The street was apparently deserted except for the three officers, Matthews and the unknown woman who continued walking away.

- The officers were armed but did not draw their guns.

- As the first officer was getting out of the squad car, he confronted Matthews, not asking his name, not asking why he was there, but demanding to know whether he "was going to rob someone."[9]

---

[9] One officer suggested that this demand was made jokingly. At the very least, joking is inconsistent with three police officers and a squad car essentially surrounding a person who is alone on the street late at night in what the officers consider a high crime neighborhood. The Majority rephrases this not-so-subtle accusation as in essence, [asking] why [Matthews] was wearing a ski mask and hoodie. *See* Majority, 9. No matter how the Majority rephrases the accusation, there is no doubt that asking Matthews whether he was going to rob someone was the exact, and the only, information that was demanded. How someone in Matthewss position at that moment could reasonably believe that he was

¶ 27. In such circumstances, a reasonable person in Matthews's position (alone, surrounded by officers with guns and a squad car) would not feel free to simply ignore the show of police authority and walk away. Indeed, the negative consequences of walking away, or refusing to submit to the show of authority, could be significant. *See e.g. Brown v. Texas*, 443 U.S. 47, 48–49, 53 (1979) (When two officers approached Brown in an alley and asked him to identify himself and explain his presence in the alley, Brown refused, was angry and said the officers had no right to question him. Brown continued to protest and was then frisked and arrested. Although ultimately a court determined Brown's arrest was a violation of his Fourth Amendment rights, the police reaction to his assertion of those rights resulted in his arrest and at least some detention.).

¶ 28. Matthews was not sought by police for prior criminal activity. The officers were not investigating a recent or specific crime in the area or otherwise as to which Matthews might have been involved. Matthews was not seen violating any law or handling any weapons. The officers saw nothing but Matthews standing on a sidewalk in a "high crime neighborhood." It was late at night. He was dressed in clothing appropriate for the weather. The officers did not know Matthews. None of the officers recognized Matthews before the stop. After the stop, and once Matthews removed his ski mask, one of the officers recognized him from a prior "encounter." The nature of that "encounter" is entirely unexplained. The officers also only observed him for twenty to thirty seconds as they drove on the 1700 block of Meinecke Avenue.

---

free to leave while he was being accused by police of planning specific criminal activity defies both imagination and common sense.

¶ 29. In those same twenty to thirty seconds, the officers also saw an unidentified woman walking her dog. The officers did not see any conversation, physical contact, or eye contact between Matthews and the woman. She passed Matthews on the sidewalk and continued walking west, towards the police. The officers observed that after passing Matthews, the woman looked over her shoulder twice at him. One officer described her as having what he thought was a "nervous look on her face."

¶ 30. When Matthews noticed the marked squad car traveling east towards him, he took his hands out of his pockets and began to walk west on Meinecke Avenue, *towards* the squad car. Based on nothing more, the squad car pulled up next to Matthews at an intersection and all three armed officers got out of the squad car. One demanded to know whether Matthews was "going to rob someone." Matthews pulled down his ski mask and answered "No." By the time he answered, he was surrounded by officers and blocked by the squad car. It is impossible to infer from those facts that Matthews was free to leave.

¶ 31. It is undisputed that after all of the officers were around him, Matthews agreed to let the officer search him. Neither meaningful time nor attenuating circumstances intervened between when Matthews was stopped and when he consented to the search. The consent was directly occasioned by the investigative stop. As the trial court correctly held, evidence seized as a result of an unreasonable stop should be suppressed. *See Harris*, 206 Wis. 2d at 263 (Because the seizure of Harris was illegal, the evidence of the packets of marijuana taken from his person was the "fruit" of an illegal seizure, and should have been suppressed.); *see also Washington*, 284 Wis. 2d 456, ¶ 19 ("[T]he drugs were recovered as the result of an unreasonable stop and an illegal seizure,

and thus should be suppressed."). I conclude that the trial court correctly applied the law to the facts in this case.

¶ 32. The Majority holds as a matter of law that the circuit court erred in suppressing the evidence seized. *See* Majority, ¶ 9. That holding requires the Majority to conclude that the investigative stop here was permissible under *Terry* and its progeny. Such a conclusion, in my view, is inconsistent with, and ignores facts which support, the holdings of our supreme court in *Richardson, Guzy,* and *Harris,* and of this court in Washington. We are not free to disregard these decisions or the facts upon which they are based.

¶ 33. For all of the foregoing reasons, I conclude that the facts found by the trial court and the undisputed facts in this record support the trial court's finding that the State failed to establish specific articulable facts that support a reasonable suspicion that Matthews had committed or was about to commit a crime. That standard is required by *Terry* and its progeny, and by both the Fourth Amendment of the United States Constitution and article I, section 11 of the Wisconsin Constitution. Consequently, I would affirm the trial court's findings.