COURT OF APPEALS
DECISION
DATED AND FILED

September 1, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1769-CR**

Cir. Ct. No. **2016CF4475**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

  V.

RAYTRELL K. FITZGERALD,

      DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: DENNIS R. CIMPL, Judge. *Affirmed*.

Before Brash, P.J., Dugan and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Raytrell K. Fitzgerald appeals his judgment of conviction for possession of a firearm contrary to a harassment injunction.

Fitzgerald was charged when a handgun was discovered in his backpack after he was stopped and frisked by Milwaukee Police Department (MPD) officers investigating a report of shots fired. Fitzgerald filed a motion to suppress the gun evidence, arguing that the police lacked reasonable suspicion for the stop and frisk.

¶2 After a hearing on Fitzgerald's motion, the trial court found that the police had established that there was reasonable suspicion for the stop and frisk, and denied the motion. Fitzgerald subsequently pled guilty. We affirm.

## BACKGROUND

¶3 The stop and frisk of Fitzgerald occurred in October 2016. The officers involved in the incident discovered that on April 8, 2016, Fitzgerald's former employer had obtained a restraining order which prohibited Fitzgerald from possessing a firearm. That order was to remain in effect until April 8, 2020. Thus, Fitzgerald was charged with possession of a firearm contrary to a harassment injunction when the officers found the gun in Fitzgerald's backpack.

¶4 In his motion to suppress, Fitzgerald argued that the police lacked reasonable suspicion for the stop and frisk. A hearing on the motion was held over two days—January 13, 2017 and July 21, 2017—during which testimony was taken from three MPD officers involved in the incident regarding the basis for the stop and frisk.

¶5 Officer Michael Driscoll testified that he and his partner were on a directed patrol mission on the night of the incident. The reason for this special assignment was because of a recent spike in violent crimes in the area. The assignment involved officers in two marked squad cars as well an undercover squad. Officer Driscoll explained that the officers on this assignment communicated

2

amongst themselves on a separate MPD radio frequency—a "side channel"—as opposed to the main MPD channel.

¶6 Officer Driscoll was in one of the marked squad cars. He testified that at approximately 10:15 p.m. that night, he heard a number of gunshots that he believed had come from the area of East Locust Street and North Buffum Street, approximately eleven blocks—about a mile—from his location at North Dousman Street and East Clarke Street.[1] Officer Driscoll reported this information to the other two squads involved in the special assignment on their side channel.

¶7 Officer Chad Boyack and his partner were in the undercover car, in the area of East Keefe Avenue and North Richards Street, approximately six blocks north of Locust and Buffum. Officer Boyack stated that he did not hear any shots, but when he and his partner received the information from Officer Driscoll, they drove south on North Holton Street toward the area where Officer Driscoll thought the shots had been fired.

¶8 As they approached East Burleigh Street, Officer Boyack testified that they observed an individual running across the intersection of Burleigh and Holton. Officer Boyack stated that this person appeared to be "holding and securing some type of object on the left side of his coat." This sighting occurred about three minutes after Officer Driscoll had broadcasted the information about shots being fired. The location of this person was approximately three blocks northeast of Locust and Buffum.

---

[1] A street map of the City of Milwaukee, marked with the locations of the officers and Fitzgerald at the time of the incident, was introduced into evidence at the motion hearing and is included in the record.

¶9     Officer Boyack explained that since they were in the undercover car, they did not stop this person because they did not want to "burn the vehicle"— expose the car as being an undercover squad. He therefore communicated his sighting to the other squads over the side channel.

¶10     Officer Mark Dillman was in the other marked squad car with his partner. Officer Dillman explained that he was not sure of his location when he heard the information broadcasted by Officer Driscoll and Officer Boyack, but he believed he was southwest of Locust and Buffum, south of West Center Street. He testified that he had not heard any gunshots, either.

¶11     Officer Dillman and his partner immediately proceeded to the area of Burleigh and Holton, where Officer Boyack had seen the individual running across the street. As they approached, they observed an individual walking eastbound on Burleigh at North Pierce Street, about two blocks east of where Officer Boyack had seen the person running across Holton Street.

¶12     Officer Dillman testified that this individual—later identified as Fitzgerald—was not doing anything suspicious at the time Officer Dillman and his partner came upon him. However, Officer Dillman observed that Fitzgerald was sweating and was out of breath, consistent with someone who had been "running vigorously." Officer Dillman and his partner exited their vehicle and approached Fitzgerald. Officer Dillman stated that he said something to Fitzgerald about running, and asked whether he had any weapons on him. Fitzgerald did not respond, and Officer Dillman proceeded to pat him down.

¶13     Officer Dillman noticed a "hump" on Fitzgerald's back, which he discovered was a backpack underneath Fitzgerald's jacket. Officer Dillman felt a "hard object" at the bottom of the backpack, consistent with "a slide of a

semiautomatic handgun." He then unzipped the backpack and found the gun at the bottom of the backpack.

¶14    Fitzgerald called Raynard E. Richards to testify on his behalf at the motion hearing. Richards, who had previously retired from MPD as a lieutenant with over thirty-three years of service, was employed with the Wisconsin State Public Defender's Office as an investigator/supervisor. Richards had made an open records request to MPD for reports of shots fired on the night of the incident in the area where Fitzgerald was arrested. There were no reports of shots fired in that area that night, although Richards acknowledged that not all shots fired get reported. Richards further noted that the MPD reports showed that no other squads were dispatched to the location where Officer Driscoll had reported hearing shots fired, even though such a report would usually generate a high priority response by MPD. Additionally, Richards noted that in his experience, it would be "extremely difficult" to pinpoint the intersection of Locust and Buffum as the location from which the shots were fired at the distance—almost a mile—that Officer Driscoll was from that area.

¶15    The trial court determined that, under the totality of the circumstances, the officers had reasonable suspicion for the stop and frisk of Fitzgerald. It found that Officer Driscoll's testimony regarding hearing the shots fired was credible, and that Officer Boyack's observation of Fitzpatrick running in that area provided reasonable suspicion to stop him. The court noted that Fitzgerald was "out of breath, sweating" when Officer Dillman spotted him, and that Officer Dillman reasonably believed Fitzgerald "might be armed" and that he "could have been in the area where the shots were reported fired," providing reasonable suspicion for the frisk. Thus, the court denied Fitzgerald's motion to suppress.

¶16 Subsequent to that decision, Fitzgerald entered a guilty plea in January 2019.[2] He was sentenced to time served. This appeal follows.

## DISCUSSION

¶17 On appeal, we review the trial court's determination that the officers had reasonable suspicion to stop and frisk Fitzgerald, which was the basis for its denial of Fitzgerald's motion to suppress. In reviewing a trial court's decision on a motion to suppress, this court applies a two-step standard of review: we review the trial court's findings of fact under the clearly erroneous standard; we then review *de novo* the application of constitutional principles to those facts. *State v. Eason*, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625. In this case, the facts relating to the incident are undisputed;[3] as such, we focus on the second step of the test. *See id.*

¶18 "The Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect people from unreasonable searches and seizures." *State v. Young*, 2006 WI 98, ¶18, 294 Wis. 2d 1, 717

---

[2] The trial court ordered a competency examination of Fitzgerald in October 2017.

[3] Although Fitzgerald does not dispute the trial court's factual findings, we noted with interest Richards' testimony that while it was plausible that Officer Driscoll heard shots being fired almost a mile from his location that night, it would be "extremely difficult" for him to pinpoint those shots to a "particular corner." However, under the clearly erroneous standard of review, "even though the evidence would permit a contrary finding, findings of fact will be affirmed on appeal as long as the evidence would permit a reasonable person to make the same finding." *Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶12, 290 Wis. 2d 264, 714 N.W.2d 530 (citation omitted). Furthermore, in our review "we search the record not for evidence opposing the [trial] court's decision, but for evidence supporting it." *See id.*

Officer Driscoll testified that this location was his "best guess" as to where the shots were fired, and the trial court found his testimony credible. "The trial court is the arbiter of the credibility of witnesses, and its findings will not be overturned on appeal unless they are inherently or patently incredible or in conflict with the uniform course of nature or with fully established or conceded facts." *Global Steel Prods. Corp. v. Ecklund*, 2002 WI App 91, ¶10, 253 Wis. 2d 588, 644 N.W.2d 269. Thus, we conclude that the trial court's factual findings relating to Officer Driscoll's testimony are not clearly erroneous.

N.W.2d 729 (footnotes omitted). A stop and frisk by police is included in these constitutional protections. *Terry v. Ohio*, 392 U.S. 1, 16 (1968).

¶19 For an investigatory stop to pass constitutional muster, the police must have a reasonable suspicion that "a crime has been committed, is being committed, or is about to be committed." *Young*, 294 Wis. 2d 1, ¶20. "The question of what constitutes reasonable suspicion is a common sense test: under all the facts and circumstances present, what would a reasonable police officer reasonably suspect in light of his or her training and experience." *State v. Young*, 212 Wis. 2d 417, 424, 569 N.W.2d 84 (Ct. App. 1997). In making this determination, there must be "articulable facts" in the record that when "taken together with rational inferences from those facts" and "viewed objectively," allow for an officer to reasonably conclude "that criminal activity may be afoot." *State v. Matthews*, 2011 WI App 92, ¶11, 334 Wis. 2d 455, 799 N.W.2d 911 (citing *Terry*, 392 U.S. at 21-22, 30). A "mere hunch that a person has been, is, or will be involved in criminal activity is insufficient." *Young*, 294 Wis. 2d 1, ¶21.

¶20 Furthermore, "[i]f a police officer reasonably suspects a person of committing a crime, he may frisk the person if he reasonably believes the person is armed and if a reasonable officer would have believed the person posed a safety risk to the officer or others." *Id.*, ¶55. This requirement seeks to "strike[] a proper balance between two important interests: the safety of law enforcement officers and the right of persons to be free from unreasonable government intrusions." *State v. Johnson*, 2007 WI 32, ¶22, 299 Wis. 2d 675, 729 N.W.2d 182. This determination is made by the trial court "'on a case-by-case basis'" by "'evaluating the totality of the circumstances[.]'" *Id.* (citation omitted).

¶21     In this case, the "articulable facts" provided by the officers to establish reasonable suspicion—which the trial court found to be credible—were: (1) Officer Driscoll's report of hearing shots fired; (2) Officer Boyack's observation of Fitzgerald running across the intersection of Burleigh and Holton; (3) that Fitzgerald looked like he was holding something on the left side of his coat as he was running; and (4) that he was sweating and out of breath when he was stopped by Officer Dillman.

¶22     Fitzgerald argues that these facts are very similar to a recent unpublished decision of this court, *State v. Lewis*, No. 2017AP234-CR, unpublished slip op. (WI App July 25, 2017). In *Lewis*, the defendant was stopped by police officers investigating a report of shots fired. *Id.*, ¶2. The basis for the stop was that the defendant was walking in the general area of the shots fired report with his hand on the waistband of his pants. *Id.* When the officers stopped him, he admitted that he was carrying a concealed weapon without a permit. *Id.* The State conceded that these were not sufficient articulable facts to establish reasonable suspicion for the stop. *Id.*, ¶¶6, 8.

¶23     The State's concession in *Lewis* was based on the similarity of those facts to the facts in *State v. Gordon*, 2014 WI App 44, 353 Wis. 2d 468, 846 N.W.2d 483. *See Lewis*, 2017AP234-CR, ¶4. In *Gordon*, we reversed the trial court's denial of a motion to suppress evidence that was seized from the defendant. *See id.*, 353 Wis. 2d 468, ¶1. The officers had stopped Gordon because he was walking in "one of the more dangerous areas of the district" that they patrolled, and because he had done a "security adjustment"—a "conscious or unconscious movement," such as touching a pants pocket, which is sometimes done by an individual who is carrying a weapon when approached by law enforcement. *Id.*, ¶¶3-4. We noted that "sadly, many, many folks, innocent of any crime, are by circumstances forced to live in

areas that are not safe," and further, that "many folks, most innocent of any nefarious purpose, may occasionally pat the outside of their clothing to ensure that they have not lost their possessions." *Id.*, ¶¶15, 17. We therefore concluded that "[p]ermitting *Terry* stops of persons momentarily patting the outside of their clothing when the *only* additional facts are that those persons are in a high crime area and have seen a cruising police car would expand the individualized reasonable suspicion requirement so far so as to negate it." *Id.*, ¶18 (internal quotation marks omitted).

¶24 Here, the State argues that there is a significant difference that distinguishes this case from *Lewis* and *Gordon*: that Officer Boyack observed Fitzgerald running across the intersection. In fact, the State contends that Fitzgerald's "running is what supports a finding of reasonable suspicion" in this case. The State also points to our statement in *Gordon* that a security adjustment— in this case, Officer Boyack's observation that Fitzgerald looked like he was holding something in his jacket while he ran—together with "flight or attempted flight" may be sufficient to support a finding of reasonable suspicion. *Gordon*, 353 Wis. 2d 468, ¶17.

¶25 Fitzgerald, on the other hand, argues that his running across the street was not a suspicious activity; for example, he "may have simply been running to stay out of traffic on Holton while it was dark out." However, "police officers are not required to rule out the possibility of innocent behavior before initiating a brief stop." *Young*, 294 Wis. 2d 1, ¶21 (citation omitted). Thus, Fitzgerald's explanation for running does not disavow the inferences made by the officers based on the facts they knew at that time. *See Young*, 212 Wis. 2d at 424. Additionally, although Fitzgerald was walking when Officer Dillman stopped him, the officer noted that Fitzgerald was sweating and out of breath, consistent with someone who had been

"running vigorously." This suggests that he had run further than just across the intersection.

¶26 Based on these facts and circumstances, we conclude that the officers reasonably inferred that Fitzgerald may have been running from the area where Officer Driscoll had heard shots fired, and further, that he may have been holding a gun in the pocket of his jacket. *See Matthews*, 334 Wis. 2d 455, ¶11. Therefore, the officers had reasonable suspicion to stop Fitzgerald. *See id.*

¶27 With regard to frisking Fitzgerald, the officers were investigating a report of shots fired, which by definition is "linked to … weapons possession," and often to "criminal activity" as well. *See Johnson*, 299 Wis. 2d 675, ¶40. In concluding that the officers had reasonable suspicion to stop Fitzgerald on their belief that he may have been involved in a shooting in the area, it was also reasonable for the officers to frisk him for weapons, to ensure their safety. *See id.*

¶28 We therefore affirm the trial court's denial of Fitzgerald's motion to suppress.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.