STATE of Wisconsin, Plaintiff-Respondent,

v.

Melvin PUGH, Defendant-Appellant.

Court of Appeals

*No. 2012AP481–CR. Submitted on briefs December 5, 2012.
—Decided December 27, 2012*

2013 WI App 12

(Also reported in 826 N.W.2d 418.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *J. Dennis Thornton*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Sarah K. Larson*, assistant attorney general.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. FINE, J.   Melvin Pugh appeals the judgment entered on his guilty plea to unlawfully possessing a firearm as a convicted felon. *See* WIS. STAT. § 941.29(2)(a). The dispositive issue on appeal is whether the circuit court properly denied Pugh's motion to suppress evidence of the gun he was carrying when the police stopped and seized him.[1] On our *de novo* review of the legal issue of whether the police lawfully seized Pugh, we conclude that they did not, and, accordingly, reverse.

## I.

¶ 2.   The only person testifying at the suppression hearing was one of the arresting officers, Timothy Keller, who had been a City of Milwaukee police officer for some six years at the time of the hearing. He told the circuit court that he and his partner, Rodolfo Alvarado, were patrolling "the area around 4400 North Hopkins" in Milwaukee when they saw Pugh shortly before 11 p.m. "in the rear of 4475 North Hopkins," a vacant and boarded-up apartment building. It is apparent from the Record that neither Keller nor his partner knew Pugh before they seized him, at least there is no evidence in the Record indicating that they did.

---

[1] A defendant may appeal an order denying a motion to suppress evidence even though the judgment of conviction rests on a guilty plea. WIS. STAT. § 971.31(10). The Honorable Rebecca F. Dallet denied Pugh's suppression motion. The Honorable Charles F. Kahn entered the judgment of conviction.

¶ 3. When the officers first saw Pugh he was five-to-ten feet from two cars that were parked below a no-parking sign at the back of the apartment building. Keller testified that some five seconds after they first saw Pugh, Keller "turned my squad spotlight on him." Keller said that after he shined the light on Pugh, Pugh, who had been "walking a little to the south . . . went back between" the cars.

¶ 4. Keller told the circuit court that 4463 North Hopkins was "directly to the south" of the apartment building at 4475 North Hopkins, and that he and his partner "had been personally involved in several investigations regarding drug dealing from that [4463 North Hopkins] address." Keller said that he walked over to Pugh and "asked him what he was doing at that location." Pugh replied that one of the cars parked beneath the no-parking sign was his. When Keller told him that the signs indicated that parking was not allowed, Pugh "said that he had been parking there since before the building was boarded up and vacant, and he just continued to do so after it was boarded up." Pugh did not say that he had permission to park there.

¶ 5. Apparently finished with the parking matter, Keller testified that "[a]t that point I kind of switched gears and then — the reason we were in that neighborhood was regarding that 4463 North Hopkins, the drug house, I asked him if he had any information for us regarding that house or if he knew anything about that house." Pugh told them "that he didn't know anything about that house." The drug house was some fifty feet away from where they were standing, and Keller testified that he never saw Pugh any closer. Keller also did not recall whether there were any lights on in the drug house and did not know whether anyone was then selling drugs from that place.

¶ 6. Keller and his partner did not pursue the drug-house inquiry with Pugh, or tell Pugh to move his car, or give Pugh a citation for parking beneath a no-parking sign. Rather, they grabbed him, and when then asked "if he had anything illegal on his person," Pugh said that "he wanted to be honest with us and that he had a gun in his pocket." The following questions and answers between the State and Keller at the suppression hearing are the focus of the issue presented by this appeal because they concern what happened when Pugh began to walk away and Officer Alvarado grabbed his arm:

A  I observed he started with some body language that was concerning to myself and my partner at that time.

Q  Could you please describe that body language, why it was concerning to you?

A  He bladed himself with his right side further away from us. I've gone through some extensive training regarding the characteristics of armed individuals.

Q  Why don't you tell us about that training.

A  Significant to me, because when an individual is concealing a firearm, it creates a bulge, and individuals will commonly turn that side of their body away to keep that bulge out of view from law enforcement.

Keller then briefly explained that "blading" was part of an "8–hour course that was put on through the Milwaukee Police Department," with an outside "expert" not otherwise identified in the Record. Keller testified that his personal experience was consistent with what the "expert" apparently told them (although, again, the Record does not tell us who the "expert" was, the nature

and area of his or her "expertise," or what he or she may have told the officers attending the course). Keller then resumed telling the circuit court about his and his partner's interaction with Pugh that night, noting that Pugh was three feet away from them when he "bladed" his body:

A   I continued talking to him, but at that time my partner, Officer Alvarado, took control of his left arm.

Q   Continue. I apologize.

A   I also would like to point out that after he began blading himself, he also started walking backwards slowly but walking away from us backwards.

Q   And what did you— Were you concerned at that point that he might be— What were you concerned about at that point?

A   The totality of these circumstances caused me to fear that he may be armed.

Q   And so your partner grabbed his arm, you stated?

A   His left arm, correct.

Q   What did you — the defendant do upon your partner grabbing his left arm?

A   I immediately observed Mr. Pugh reach in, his right hand down toward his right pants pocket.

Q   And what did you do in response to—to his reaching toward his pocket?

A   I grabbed onto his right wrist.

It was then that Keller asked Pugh whether he had "anything illegal," and Pugh admitted that he had a gun.

## II.

¶ 7. As noted, this appeal focuses on whether the officers, specifically Officer Alvarado because he grabbed Pugh first and this was the trigger for what Keller did right after that, could, consistent with the Constitution, seize Pugh. For the reasons explained below, they could not.

■■

¶ 8. Whether a police officer may lawfully seize a person is governed by the Fourth Amendment to the United States Constitution and article I, section 11 of the Wisconsin Constitution, which have been construed congruently. *State v. Phillips*, 218 Wis. 2d 180, 195, 577 N.W.2d 794, 801 (1998). In reviewing a trial court's suppression ruling, we uphold the trial court's findings of historical fact unless they are clearly erroneous. *State v. Roberts*, 196 Wis. 2d 445, 452, 538 N.W.2d 825, 828 (Ct. App. 1995); *see also* WIS. STAT. RULE 805.17(2) (made applicable to criminal proceedings by WIS. STAT. § 972.11(1)). Whether a seizure violates the constitution, however, is a legal question that we review *de novo*. *State v. Richardson*, 156 Wis. 2d 128, 137–138, 456 N.W.2d 830, 833 (1990).

■■

¶ 9. *Terry v. Ohio*, 392 U.S. 1, 22 (1968), recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Thus, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*,

490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). It is not necessary, however, that the officer suspect that the unlawful activity is a *crime* in the technical sense of that word; it is enough that the officer have "a reasonable suspicion that something unlawful might well be afoot." *State v. Waldner*, 206 Wis. 2d 51, 58–60, 556 N.W.2d 681, 685–686 (1996) (noting that the suspicious activity in *Terry*, walking back and forth on a public street, was not unlawful).

¶ 10.   Here, as we have seen, the officers had at the outset reasonable suspicion that someone, and, given his proximity to the cars, perhaps Pugh, was parking illegally. Unlawful parking under the circumstances as described by Officer Keller is a forfeiture offense, not a "crime." *See* WIS. STAT. §§ 346.55(3) & (4), 346.56(1m).[2] Nevertheless, the officers had a right to ask Pugh about it. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) (officers free to walk up to persons and ask them questions); *see also State v. Griffin*, 183 Wis. 2d 327, 333–334, 515 N.W.2d 535, 538 (Ct. App. 1994)

---

[2] As material, WIS. STAT. § 346.55 provides:

(3) No person may leave or park any motor vehicle on private property without the consent of the owner or lessee of the property.

(4) Owners or lessees of public or private property may permit parking by certain persons and limit, restrict or prohibit parking as to other persons if the owner or lessee posts a sign on the property indicating for whom parking is permitted, limited, restricted or prohibited. No person may leave or park any motor vehicle on public or private property contrary to a sign posted thereon.

WISCONSIN STAT. § 346.56(1m) provides:   "Any person violating s. . . . 346.55(3) or (4) may be required to forfeit not less than $20 nor more than $40 for the first offense and not less than $50 nor more than $100 for the 2nd or subsequent conviction within a year."

(police may stop a person if they have reasonable suspicion that the person may have committed a forfeiture offense). Indeed, as *Bostick* observed, 501 U.S. at 434, *Terry* was quite clear on this point: "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19 n.16 (There was "no intrusion upon constitutionally protected rights" until the officer searched Terry.). Thus, when Officer Alvarado grabbed Pugh, the officers seized Pugh. Just as the officers were free to ask Pugh questions—whether about the parking or whether he was aware of any drug-dealing in the area—once the officers abandoned the parking matter and the issuance of a possible citation, Pugh was equally free to walk away. *See Florida v. Royer*, 460 U.S. 491, 497–498 (1983) ("The person approached [by a law-enforcement officer], however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way."). Indeed, as we saw, it was Pugh's walking away that prompted the officers to seize him, and we now turn to that.

█ █

¶ 11.   The test we apply in determining whether an officer has the sufficient reasonable suspicion under the *Terry* line of cases is objective—that is, "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21–22 (citation omitted). Thus, although an officer's subjective belief might color an objective analysis by giving context to an otherwise dry recitation of facts, "simple good faith on the part of

the arresting officer is not enough" because if it were, "the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers and effects, only in the discretion of the police." *Id.*, 392 U.S at 22 (quotation marks omitted).

■■ ■

¶ 12.   Here:

- Keller asked Pugh about the apparent illegal parking but did not ask him to move his car or do anything that indicated he was going to give Pugh a citation.

- Keller then asked Pugh about the nearby alleged drug house. As we have seen, under the circumstances here, Pugh could have just walked away at that point because the law is clear that he did not have to answer any questions.

- Pugh did answer Keller's questions about drug dealing, and denied knowing anything about it. Thus, there was nothing that objectively indicated that criminal activity was afoot in regards to any connection Pugh might have had with the house at 4463 North Hopkins, some fifty feet away.

- According to Keller's uncontradicted testimony though:   (1) Pugh started to back away, and, in doing so, (2) the "right side" of Pugh's body turned "further away from us."

Of course, as we have seen, Pugh had the right to walk away. Thus, without more, backing away from a police officer is not sufficient objective evidence supporting a reasonable suspicion that criminal activity is afoot or that he was a threat. Further, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a

crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). *See also State v. Washington*, 2005 WI App 123, ¶¶ 3, 17, 284 Wis. 2d 456, 460, 471, 700 N.W.2d 305, 307, 312 (Seeing a suspect in front of vacant house is insufficient reason to stop him even though: (1) the officer knew that the suspect did not live in the area, (2) the suspect had been previously arrested for selling narcotics, and (3) the police had received a complaint that someone was loitering in the area.); *Sims v. Stanton*, ___ F.3d ___, ___, No. 11–55401, 2012 WL 5995447, *6 (9th Cir. 2012) ("We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business.") (one set of quotation marks, brackets and quoted source omitted).[3] That leaves Pugh not keeping the front surface of his body parallel to a line extending from one officer to the other—that is, turning his body, or, to use Officer Keller's word, "blading"—as he backed away from them.[4] But how does a person walk away from another (as Pugh had the right to do) without turning his or her body to some degree? Calling a movement that would accompany *any* walking away "blading" adds nothing to the calculus except a false patina of objectivity.

¶ 13. In sum, the officers had no objective reasonable suspicion to justify a *Terry* seizure. Accordingly, Officer Alvarado violated Pugh's Fourth Amendment

---

[3] *Sims v. Stanton* was modified on January 16, 2013, (2013 WL 174448 (9th Cir. 2013)), and the quoted material is now on page *7.

[4] Although Keller, as we have seen, testified that they seized Pugh because he turned his "*right* side further away from us" (emphasis added), there is nothing in the Record that indicates that Keller and Alvarado would not have also seen danger if Pugh had turned his left side away from them.

rights when he grabbed Pugh's arm. Thus, although Officer Keller might have been justified when he grabbed Pugh immediately thereafter when Pugh tried to reach into his pocket, *see State v. Betow*, 226 Wis. 2d 90, 94, 593 N.W.2d 499, 502 (Ct. App. 1999) ("additional suspicious factors" may trigger law-enforcement's more intrusive response), Alvarado's seizure—the initial grabbing—was unlawful and all subsequent evidentiary fruits must be suppressed. *See State v. Felix*, 2012 WI 36, ¶ 30, 339 Wis. 2d 670, 690, 811 N.W.2d 775, 785 (Suppression is the usual remedy in connection with "evidence obtained 'by exploitation of' the illegal government activity.") (quoted source omitted); *State v. Morgan*, 197 Wis. 2d 200, 217, 539 N.W.2d 887, 894 (1995) (Geske, J., concurring on behalf of six justices) ("[H]indsight cannot constitutionally be employed to justify a pat-down."). We reverse the judgment of conviction.

*By the Court.*—Judgment reversed.