STATE of Wisconsin, Plaintiff-Respondent,†

v.

Patrick E. GORDON, Defendant-Appellant.

Court of Appeals

*No. 2013AP1878–CR. Submitted on briefs March 4, 2014.
—Decided March 18, 2014.*

2014 WI App 44

(Also reported in 846 N.W.2d 483.)

† Petition for Review Filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Colleen Marion,* assistant state public defender, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen,* attorney general and *Jeffrey J. Kassel,* assistant attorney general.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. FINE, J. Patrick E. Gordon appeals the judgment entered on his guilty plea convicting him of unlawfully (1) possessing "[o]ne gram or less" of cocaine with intent to deliver, *see* WIS. STAT. § 961.41(1m)(cm)1g, and (2) carrying a concealed weapon, *see* WIS. STAT. § 941.23(2). The only issue on appeal is whether the circuit court properly denied his pre-plea motion to suppress evidence of the gun and cocaine that the police discovered after they stopped Gordon and two friends as they were walking on a Milwaukee street at around 11 p.m. on August 8, 2012.[1] We reverse.

**I.**

¶ 2. Gordon and two of the three arresting officers, Richard Ticcioni and Mark Dillman, testified at the suppression hearing. Inasmuch as the circuit court found that the officers' testimony was credible, and Gordon does not challenge the circuit court's findings of

---

[1] A defendant may appeal from an order denying a motion to suppress evidence even though the judgment of conviction rests on a guilty plea. WIS. STAT. § 971.31(10).

historical fact, *see* Wɪs. Sᴛᴀᴛ. Rule 805.17(2) (circuit court's findings of fact must be upheld on appeal unless "clearly erroneous"), made applicable to criminal proceedings by Wɪs. Sᴛᴀᴛ. § 972.11(1), we limit our discussion to the officers' testimony and to the circuit court's findings.

¶ 3. The night the officers stopped Gordon, Ticcioni was in the passenger seat of a marked squad car being driven by police officer Sean Mahnke. Officer Dillman was in the back. They were driving westbound on Keefe Avenue in Milwaukee, slowing for an approaching stoplight when they saw Gordon and his two friends walking in the same direction. Ticcioni said the area was "very well-lit" but was also "one of the more dangerous areas of the district" to which he was assigned, noting that two days earlier someone shot a woman in her car there.

¶ 4. Officer Ticcioni testified that one of his duties was to ferret out "[i]nstances where individuals are carrying guns illegally." He told the circuit court about the training that helped him determine whether someone was unlawfully carrying a gun: "Individuals that they [*sic*] carry guns on the street — typically illegally — will do movements, things called security adjustments, just characteristics of individuals that can be carrying weapons." He then explained what he meant by "security adjustments":

> A security adjustment is — is, basically, a conscious or unconscious movement that an individual does when they're confronted by law enforcement when they're typically carrying a weapon. What it is is it's that individual either placing a hand over a pocket or in the waistband, where that gun is, just to make sure that the weapon is still there, that it's secured.

471

Officer Ticcioni candidly admitted on the State's direct-examination that "[a]nybody can" check for things other than a secreted weapon:

> [M]ales that carry wallets in their back pocket, people that carry cell phones in their pocket, many times throughout the day, you're gonna touch your back pocket to make sure your wallet's there, to make sure it's secure, that it hasn't somehow fallen out of your pocket. You — I'm sure a lot of people touch their pants pockets to make sure their phone is in there. It's just kind of an unconscious thing people do to make sure something of value and — that they know they have on them is there.

Ticcioni agreed with the prosecutor that "eye contact between yourself and an individual is relevant" to the hidden unlawful-weapon assessment, and added that if the person was unduly nervous and appeared to be "getting ready — attempting to flee from us on foot," the person "will hold onto this or grab on to this in their waistband." The State did not assert, however, and the officers did not testify that either Gordon or his friends were preparing or trying to flee from the officers. Rather, Ticcioni told the circuit court that he saw Gordon "perform what we talked to before, a security check, to his left front pants pocket." The "check" was the one- or two-second touching of the "outside of his pocket" with the palm of his hand. Gordon only did that once. Ticcioni said on cross-examination that he did not see any bulges in the jeans that Gordon wore.

¶ 5. Officer Ticcioni explained that he decided to stop Gordon because Ticcioni "recognized that — that he [Gordon] had observed our squad car, made the security adjustment, and that kind of alerted me." Ticcioni also testified that Gordon looked "nervous" and too young to be lawfully carrying a firearm under

Wisconsin's then new concealed-carry permit law.[2] Ticcioni said he told the driver of the squad car to stop, saying " 'Mahnke, hold up. We're gonna talk to these guys here.' " He conceded on cross-examination, though, that none of the officers had any information that Gordon or his friends had either done anything wrong or were under suspicion for having done anything wrong, and admitted that, as phrased by Gordon's trial lawyer, "the reason why you made that decision is because of this security adjustment."

¶ 6. According to Officer Ticcioni, the three officers approached Gordon and his friends and said: " 'Hey guys. Can we see your hands?' " They all put "their hands up." The officers then frisked the three men and found on Gordon, according to Ticcioni's testimony, "a very small .22 caliber" pistol. As recited by the criminal complaint, the officers also found in Gordon's pants pocket "1.78 grams" of crack cocaine "packaged into twenty-two (22) corner-cut baggies," as well as "4.18 grams" of marijuana "packaged into five (5) corner-cut baggies."[3] (Bolding omitted.)

---

[2] 2011 Wis. Act 35 modified Wisconsin's laws to permit licensed persons to carry concealed weapons. *See* 2011 Wis. Act 35, § 38 (creating Wis. Stat. § 175.60(2g); § 54 (creating Wis. Stat. § 941.23(2)(d)); § 101 (With exceptions not material here, the act took effect "on the first day of the 4th month beginning after publication," which was July 22, 2011.).

[3] Despite the Complaint's assertion that the crack cocaine weighed "1.78" grams, both the Complaint and the Information charged Gordon with possessing "1 gram or less" of "cocaine." (Uppercasing and bolding omitted.) The parties do not explain the difference between the body of the Complaint and the charging sections of both the Complaint and the Information, and this does not affect the legal issue that we have to decide.

¶ 7. Officer Dillman also testified, and his testimony essentially tracked what Officer Ticcioni told the circuit court, except that he said that *he* had told the squad car's driver to stop so they could check out Gordon and his friends. He also testified that neither Gordon nor his friends started to walk faster once it appeared that they had seen the squad car or after the officers got out of it.

¶ 8. As noted, the circuit court denied Gordon's suppression motion, and agreed with Gordon's trial lawyer that, as phrased by the lawyer, "the most significant and critical issue was whether or not the security adjustment or check that they saw Mr. Gordon perform gave them the legal authority to stop Mr. Gordon." We agree that the "stop" was the pivotal point because if the "stop" was unlawful, the rest of what happened is not material to whether the circuit court erred in denying Gordon's suppression motion. *See State v. Morgan*, 197 Wis. 2d 200, 217, 539 N.W.2d 887, 894 (1995) (Geske, J., concurring on behalf of six justices) ("[H]indsight cannot constitutionally be employed to justify a patdown."); *id.*, 197 Wis. 2d at 223, 539 N.W.2d at 897 (Abrahamson, J., dissenting) ("[H]indsight does not satisfy the federal or state constitution.").

¶ 9. In its oral decision, the circuit court found, as material:

- The officers stopped Gordon in an "area of high crime."

- The area was one of "a very high-volume, violent crime area with a lot of gun violence."

- On the night of the stop, the "officers believed the three individuals [Gordon and his friends] recognized the police presence."

- After "the police presence was recognized," the officers "saw the defendant with his left hand reach toward the left front pants pocket."

- This was the "security adjustment" about which the officers testified, and the circuit court further found: SU32A security adjustment, I believe the testimony was, is basically a conscious or unconscious movement that an individual does when they're confronted by law enforcement when they're typically carrying, you know, a weapon, and it's done either by the individual placing a hand over the pocket or a waistband where the gun might be, just to make sure that the weapon is still there and that it's secure.

- The officers believed that Gordon looked too young to be lawfully carrying a concealed weapon under Wisconsin's concealed carry law.

Inasmuch as the lawfulness of the officers' stop of Gordon turns on whether they had a reasonable suspicion that Gordon might have been armed, the officers' belief as to how old Gordon appeared to be would only be material if they had an objectively reasonable belief that he was armed. *See Florida v. J.L.*, 529 U.S. 266, 273 n* (2000) (Young age of suspect in connection with law making it unlawful for a person of that age to carry a gun was material only if the police "could be confident that he was carrying a gun in the first place."). As we explain in Part II, the officers here did not have an objectively reasonable belief that he was armed. Nevertheless, we include the circuit court's finding about the officers' belief about Gordon's age in order to fully set out facts the circuit court found in concluding that the officers had a right to stop Gordon that night.

¶ 10. We review *de novo* the circuit court's legal conclusion that "the officer[s] had a right to approach Mr. Gordon and the other two individuals on the street." *See State v. Krier*, 165 Wis. 2d 673, 676, 478 N.W.2d 63, 65 (Ct. App. 1991) (We review *de novo* the lawfulness of an investigatory stop.). Resolution of that issue turns on the Fourth Amendment to the United States Constitution and its application here under the teachings of *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny.

## II.

¶ 11. The Fourth Amendment to the United States Constitution is the securing anchor of the right of persons to their privacy against government intrusion. It provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Section 11 of the Wisconsin Constitution is almost identical:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

We have generally construed these provisions to protect the same interests, *State v. Phillips*, 218 Wis. 2d 180,

195, 577 N.W.2d 794, 801 (1998), and Gordon does not argue that we should not do so here.

¶ 12. *Terry*, 392 U.S. at 22, recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Thus, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). The test is not what the officer may have subjectively believed, but, rather, whether, viewed *objectively,* a reasonable officer would have the requisite "reasonable suspicion" that a *Terry* stop was warranted. *State v. Pugh*, 2013 WI App 12, ¶ 11, 345 Wis. 2d 832, 842, 826 N.W.2d 418, 423 (Ct. App. 2012). As we explained in *Pugh*:

> The test we apply in determining whether an officer has the sufficient reasonable suspicion under the *Terry* line of cases is objective—that is, "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21–22 (citation omitted). Thus, although an officer's subjective belief might color an objective analysis by giving context to an otherwise dry recitation of facts, "simple good faith on the part of the arresting officer is not enough" because if it were, "the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers and effects, only in the discretion of the police." *Id.*, 392 U.S. at 22 (quotation marks omitted).

477

*Pugh*, 2013 WI App 12, ¶ 11, 345 Wis. 2d at 841–842, 826 N.W.2d at 423. Further, "to accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure." *United States v. Martinez-Fuerte*, 428 U.S. 543, 560 (1976). *See also Michigan v. Summers*, 452 U.S. 692, 699 n.9 (1981). Thus, circumstances must not be so general that they risk sweeping into valid law-enforcement concerns persons on whom the requisite individualized suspicion has not focused. *Bailey v. United States*, 568 U.S. ___, 133 S.Ct. 1031, 1039–1040 (2013) (Police may not detain persons leaving a building that was the target of a search warrant when those persons were "beyond the immediate vicinity of the premises to be searched.").

¶ 13. Although, as the State argues, things that may appear on their surface to be wholly innocent may, in context, trigger an objective "reasonable suspicion" to permit the further investigation that *Terry* and its progeny permit, there must be other circumstances that prime that trigger. *See State v. Waldner*, 206 Wis. 2d 51, 58–60, 556 N.W.2d 681, 685–686 (1996) (noting that the suspicious activity in *Terry*, walking back and forth on a public street, was not in and of itself unlawful). With this background, we now turn to the circuit court's findings to see whether taken as a whole they support a reasonable officer's objective "reasonable suspicion" that "criminal activity" by Gordon (whose momentary glancing pat to the outside of his left front pants pocket triggered the stop) was "afoot."

■

¶ 14. As we have seen, the circuit court's findings distill into three components: (1) Gordon was in a high-crime area; (2) Gordon and his friends "recognized the police presence"; and, as a result, (3) Gordon patted

the outside of his pants pocket. Without more (such as, for example and not by way of limitation, the officers being aware that the person they wanted to stop was either wanted on a warrant or was known to have committed gun crimes), these findings, either taken separately or added together, do not equal the requisite objective "reasonable suspicion" that "criminal activity" by Gordon was "afoot." Thus, this case is starkly different than *State v. Matthews*, 2011 WI App 92, ¶ 11, 334 Wis. 2d 455, 462–463, 799 N.W.2d 911, 914, where there *was* more: "(1) a man in a high-crime area; (2) late at night; (3) wearing a ski mask that covers his face below his eyes; (4) wearing a hoodie; (5) who had an ambiguous but 'unusual'-appearing encounter with a woman walking by herself."

■■

¶ 15. First, although presence in a high-crime area could, given circumstances other than what we have here, be a significant aspect of the "reasonable suspicion" calculus, either standing alone or combined with what we have here, it adds nothing; sadly, many, many folks, innocent of any crime, are by circumstances forced to live in areas that are not safe—either for themselves or their loved ones. Thus, the routine mantra of "high crime area" has the tendency to condemn a whole population to police intrusion that, with the same additional facts, would not happen in other parts of our community. "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).[4] *See also Morgan*, 197 Wis. 2d

---

[4] Adding flight to the mix, however, might support the requisite "reasonable suspicion." *Illinois v. Wardlow*, 528 U.S.

at 212–213, 539 N.W.2d at 892–893 ("We recognize . . . that many persons 'are forced to live in areas that have 'high crime' rates or they come to these areas to shop, work, play, transact business, or visit relatives or friends. The spectrum of legitimate human behavior occurs every day in so-called high crime areas.' Furthermore, Professor LaFave warns that 'simply being about in a high-crime area should not of itself ever be viewed as a sufficient basis to make an investigative stop.' ") (Affirming the denial of the defendant's suppression motion because the police officer also saw the defendant leave and enter "two alleys in rapid succession," at four in the morning, while "driving a car with expired license plates," and the defendant "nervously fail[ed] to locate his operator's license."). Moreover, "[w]e must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business." *Sims v. Stanton*, 706 F.3d 954, 963 (9th Cir. 2013) (one set of quotation marks and quoted source omitted; brackets in *Sims*), *rev'd on other grounds*, 571 U.S. ___, 134 S.Ct. 3 (*per curiam*). As recently explained in *United States v. Black*, 707 F.3d 531, 542 (4th Cir. 2013):

> In our present society, the demographics of those who reside in high crime neighborhoods often consist of racial minorities and individuals disadvantaged by their social and economic circumstances. To conclude that mere presence in a high crime area at night is

119, 124 ("[I]t was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police."); *id .,* 528 U.S. at 126 (Court rejected Illinois's request for "a 'bright-line rule' authorizing the temporary detention of anyone who flees at the mere sight of a police officer.") (Stevens, J., on behalf of himself and three other justices).

sufficient justification for detention by law enforcement is to accept *carte blanche* the implicit assertion that Fourth Amendment protections are reserved only for a certain race or class of people. We denounce such an assertion.

So do we.

¶ 16. Second, recognition of "police presence" would be in almost every case where police executed a *Terry* stop. Looking at police officers driving through one's community certainly adds nothing by itself (that is, for example, without flight or attempted flight—*see Wardlow*, 528 U.S. at 124–125, discussed above and in footnote 4).

¶ 17. Third, the circuit court's main rationale in denying Gordon's suppression motion was what it found was Gordon's "security adjustment." But, as Officer Ticcioni recognized, many folks, most innocent of any nefarious purpose, may occasionally pat the outside of their clothing to ensure that they have not lost their possessions. Indeed, this makes even more sense in a high crime area than it might in other less crime-ridden parts of our community. Although, as Ticcioni explained, the "security adjustment" could, given additional facts (such as, for example, flight or attempted flight), support an objective "reasonable suspicion," the additional facts here—high crime area and recognizing the police car as a police car—are far too common to support the requisite individualized suspicion here.

¶ 18. Permitting *Terry* stops of persons momentarily patting the outside of their clothing when the *only* additional facts are that those persons are in a high crime area and have seen a cruising police car would expand the individualized "reasonable suspicion" re-

quirement so far so as to negate it. Accordingly, we reverse.[5]

[5] The State argues that we should follow *United States v. Moore*, 2013 WL 273864 (E.D. Wis. Jan. 24, 2013), which overruled a magistrate judge's recommendation to issue a suppression order, and upheld a *Terry* stop under circumstances similar to what we have here (and, coincidently, also involved Officer Richard Ticcioni as an arresting officer). *Id.* at *1. The district court first held that the defendant had not been seized. We set out the pertinent part of the district court's analysis:

> Once the officers exited the squad car and approached [the defendant] on foot, there is a factual dispute as to whether [one of the officers—not Officer Ticcioni] said "Milwaukee police, can I see your hands" or "Stop, show me your hands" (as [the defendant] testified). The [magistrate judge] did not resolve this dispute or explain which testimony she found more or less credible. Instead, she explained that it is "uncontested that the men understood it as a command because all three immediately complied and raised their hands in the air." . . . The fact that [the defendant] (and his cohorts) actually stopped and raised their hands is irrelevant to the issue of whether there was a seizure . . . . [The defendant]'s subjective perception that [the officer]'s query was a command does not transform the encounter into a seizure.
>
> Of course, what [the officer] actually said is important in determining whether there was a seizure. [The officer] testified that he did not order or command but simply asked [the defendant] to show his hands. The Court finds that [the officer]'s version is credible, particularly because his testimony was corroborated by the other officers on the scene. Additionally, while the officers approached [the defendant] from the opposite side of the street in their squad car, they did not activate the car's sirens or lights and did not attempt to impede [the defendant]'s means of egress with the car . . . . All three officers got out of the car, but their demeanor could hardly be described as threatening. None of the officers drew their weapons, made physical contact (at least before [the defendant] announced he had a weapon), or used a raised or urgent tone of voice. Accordingly, the Court finds that a reasonable person in [the defendant]'s position would have felt free to leave his encounter with police on the night of July 30, 2012.

*Id.* at *2 (footnote omitted). The State here does not argue that the police officers did not "stop" Gordon when they

*By the Court.*—Judgment reversed.

approached him and directed that he and his friends show their hands.

The district court in *Moore* also, albeit in the alternative, held that the officers there had the requisite reasonable suspicion to stop the defendant:

> Even if [the defendant] was seized, his seizure was supported by reasonable suspicion.
>
> . . . .
>
> Here, the officers were patrolling a high crime area, and they were on alert due to some recent shootings. Two of the officers saw [the defendant] look back at their squad car, then make a motion with his arm which they reasonably believed to be a "safety check" for a weapon. It makes no difference that [the defendant] had his back to the officers and the officers could not actually see the weapon. A person trying to conceal a gun is not likely to make it visible to an approaching police officer. On the other hand, a police officer with experience observing how people act when concealing a weapon is entitled to draw upon that experience and make reasonable inferences therefrom. It also makes no difference that the officers did not know whether [the defendant] had a permit for the weapon they suspected he was concealing. The fact that [the defendant] made the "safety check" gesture only after seeing a police squad car suggests a guilty conscience in that regard, and it also suggests, as [the officer] explained, that [the defendant] could have been anticipating a gunfight with the approaching officers. Ultimately, [the defendant]'s behavior and mannerisms when seeing the officers' approaching squad car in an area of high crime was enough for the officers to reasonably suspect that [the defendant] was either unlawfully carrying a weapon or planning to use a weapon unlawfully.

*Id.* at *3. We decline to follow the district court opinion in *Moore. See State v. Webster*, 114 Wis. 2d 418, 426 n.4, 338 N.W.2d 474, 478 n.4 (1983) (State courts are bound by decisions of the United States Supreme Court interpreting federal law, not those of the lower federal courts.).