COURT OF APPEALS
DECISION
DATED AND FILED

December 15, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If
published, the official version will appear in
the bound volume of the Official Reports.

A party may file with the Supreme Court a
petition to review an adverse decision by the
Court of Appeals. *See* WIS. STAT. § 808.10 and
RULE 809.62.

**Appeal No.** **2020AP878-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2019CF2611

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

　　　　PLAINTIFF-RESPONDENT,

　　V.

AVAN RONDELL NIMMER,

　　　　DEFENDANT-APPELLANT.

　　　　APPEAL from a judgment of the circuit court for Milwaukee County:
GLENN H. YAMAHIRO, Judge. *Reversed and cause remanded with directions.*

　　　　Before Brash, P.J., Donald and White, JJ.

　　　　**Per curiam opinions may not be cited in any court of this state as precedent
or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

　　　　¶1　　PER CURIAM.　Avan Rondell Nimmer appeals his judgment of
conviction for possession of a firearm by a felon.　Nimmer pled guilty after the trial

court denied his motion to suppress evidence of a handgun found in his possession when he was stopped and frisked by police investigating a ShotSpotter alert. Nimmer contends that police did not have reasonable suspicion to stop and frisk him. We agree, and therefore reverse and remand this matter for the entry of an order granting Nimmer's motion to suppress.

## BACKGROUND

¶2      In June 2019, officers from the Milwaukee Police Department were on patrol in the area of 20th Street and Hopkins in the City of Milwaukee. At approximately 10:06 p.m., the officers received a ShotSpotter alert that four gunshots had been fired at 3390 N. 21st Street.

¶3      The officers drove the short distance to that area, and observed Nimmer about 100 feet from the location of the ShotSpotter alert, with his hand in his right pocket. The officers stated that when Nimmer saw the squad car, he looked away and began walking faster.

¶4      The officers exited their squad and approached Nimmer, who then reached for his left side and "bladed" his left side away from the officers. One of the officers then proceeded to pat down Nimmer, who told the officer "the gun's on my waistline bro." A Smith & Wesson .40 caliber handgun was found concealed in the waistband of Nimmer's pants, under his t-shirt.

¶5      The officers took Nimmer into custody. He was charged with possession of a firearm by a felon after it was found that Nimmer had previously been convicted of possession of THC with intent to deliver.

¶6      Nimmer filed a motion to suppress the evidence of the handgun, arguing that the investigative stop was not supported by reasonable suspicion or

2

probable cause that he was engaged in criminal activity. A suppression hearing was held in August 2019, where one of the arresting officers, Anthony Milone, testified. Officer Milone explained about receiving the ShotSpotter alert, arriving at the scene, and observing Nimmer at "basically the exact location" of the ShotSpotter alert. Officer Milone testified that he did not see anyone else in the area.

¶7 Officer Milone stated that he observed Nimmer's hand in his right pocket. He further testified that when Nimmer saw the squad car, he began "accelerating his walking pace" in "an attempt to maybe run from police." As Officer Milone approached Nimmer, he saw him "digging around" on his left side, and said that Nimmer turned his left side away from the officer. When Nimmer stopped, Officer Milone said he conducted a pat down for officer safety, based on "the ShotSpotter, the accelerated walking pace, digging around his left [side], blading, all of those factors[.]"

¶8 Nimmer also testified. He stated that he had heard two gunshots right after his girlfriend had left his residence at 3392 North 21st Street. He said that he ran to the window but did not see her, so he then ran outside to try to find her, at which point the police officers stopped him.

¶9 The trial court denied the motion to suppress. It found that based on Officer Milone's testimony—which it found to be credible—the officers were at the site of the ShotSpotter alert "within one minute" of receiving the alert, and that Nimmer was the only person in the area. The court also considered that Nimmer had "accelerated his pace of walking in response to learning that the police were near him," and that "blading is consistent with someone trying to conceal a weapon." The court concluded that the timing was the "key" that "solidifie[d] reasonable suspicion," because "anyone that they encountered within a minute or

3

two of receiving the alert should have been investigated if they were within a couple of blocks of the alleged shots being fired."

¶10    Nimmer subsequently entered into a plea agreement, whereby the State would recommend eighteen months of initial confinement followed by two years of extended supervision. The trial court sentenced Nimmer to two years of initial confinement, followed by two years of extended supervision. This appeal follows.

## DISCUSSION

¶11    On appeal, we review the trial court's determination that the officers had reasonable suspicion to stop and frisk Nimmer—the basis for its denial of Nimmer's motion to suppress—which resulted in Nimmer pleading guilty to the felon in possession charge. The review of a trial court's decision on a motion to suppress presents a mixed question of fact and law. *State v. Eason*, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625. We will not reverse the trial court's findings of fact unless they are clearly erroneous; however, we review *de novo* the application of constitutional principles to those facts. *Id.*

¶12    "The Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect people from unreasonable searches and seizures." *State v. Young*, 2006 WI 98, ¶18, 294 Wis. 2d 1, 717 N.W.2d 729 (footnotes omitted). A stop and frisk by police is included in these constitutional protections. *Terry v. Ohio*, 392 U.S. 1, 16 (1968).

¶13    For an investigatory stop to pass constitutional muster, the police must have a reasonable suspicion that "a crime has been committed, is being committed, or is about to be committed." *Young*, 294 Wis. 2d 1, ¶20. "The question of what

constitutes reasonable suspicion is a common sense test: under all the facts and circumstances present, what would a reasonable police officer reasonably suspect in light of his or her training and experience." *State v. Young*, 212 Wis. 2d 417, 424, 569 N.W.2d 84 (Ct. App. 1997). In making this determination, there must be "articulable facts" in the record that when "taken together with rational inferences from those facts" and "viewed objectively," allow for an officer to reasonably conclude "that criminal activity may be afoot." *State v. Matthews*, 2011 WI App 92, ¶11, 334 Wis. 2d 455, 799 N.W.2d 911 (citing *Terry*, 392 U.S. at 21-22, 30). A "mere hunch that a person has been, is, or will be involved in criminal activity is insufficient." *Young*, 294 Wis. 2d 1, ¶21.

¶14 Furthermore, "[i]f a police officer reasonably suspects a person of committing a crime, he may frisk the person if he reasonably believes the person is armed and if a reasonable officer would have believed the person posed a safety risk to the officer or others." *Id.*, ¶55. This requirement seeks to "strike[] a proper balance between two important interests: the safety of law enforcement officers and the right of persons to be free from unreasonable government intrusions." *State v. Johnson*, 2007 WI 32, ¶22, 299 Wis. 2d 675, 729 N.W.2d 182. This determination is made by the trial court "'on a case-by-case basis'" by "'evaluating the totality of the circumstances[.]'" *Id.* (citation omitted).

¶15 In this case, the articulable facts, as explained by Officer Milone and considered by the trial court, were (1) that there had been a ShotSpotter alert; (2) that the officers saw Nimmer in the area of that alert immediately following the alert; and (3) when Nimmer saw the squad car he "bladed" and accelerated his walking pace. To determine whether these facts are sufficient to support the trial court's finding of reasonable suspicion under the standard set forth, there are several

relevant cases—decided by both this court and our supreme court—that we review for guidance.

¶16     First, we note that the facts of this case are very similar to a relatively recent unpublished decision of this court, *State v. Lewis*, No. 2017AP234-CR, unpublished slip op. (WI App July 25, 2017).[1]  In *Lewis*, the defendant was stopped by police officers investigating a report of shots fired.  *Id.*, ¶2.  The basis for the stop was that the defendant was walking in the general area of the shots fired report with his hand on the waistband of his pants.  *Id.*  When the officers stopped him, he admitted that he was carrying a concealed weapon without a permit.  *Id.*

¶17     The State in *Lewis* conceded that these were not sufficient articulable facts to establish reasonable suspicion for the stop, and the trial court's denial of Lewis's motion to suppress was reversed.  *Id.*, ¶¶6, 8.  The State's concession was based in part on the similarity of those facts to the facts in *State v. Gordon*, 2014 WI App 44, 353 Wis. 2d 468, 846 N.W.2d 483.  *See Lewis*, 2017AP234-CR, ¶4.  In *Gordon*, this court reversed the trial court's denial of a motion to suppress evidence that was seized from the defendant.  *See id.*, 353 Wis. 2d 468, ¶1.  The officers had stopped Gordon because he was walking in "one of the more dangerous areas of the district" that they patrolled, and because he had done a "security adjustment"—a "conscious or unconscious movement," such as touching a pants pocket, which is sometimes done by an individual who is carrying a weapon when approached by law enforcement.  *Id.*, ¶¶3-4.

---

[1]  Although this case was not published, we may use it as persuasive authority pursuant to WIS. STAT. RULE 809.23(3)(b) (2017-18).  All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶18    We noted that "sadly, many, many folks, innocent of any crime, are by circumstances forced to live in areas that are not safe," and further, that "many folks, most innocent of any nefarious purpose, may occasionally pat the outside of their clothing to ensure that they have not lost their possessions." *Id.*, ¶¶15, 17. We therefore concluded that "[p]ermitting *Terry* stops of persons momentarily patting the outside of their clothing when the *only* additional facts are that those persons are in a high crime area and have seen a cruising police car would expand the individualized reasonable suspicion requirement so far so as to negate it." *Id.*, ¶18 (internal quotation marks omitted).

¶19    This court reached a comparable conclusion on similar facts in *State v. Pugh*, 2013 WI App 12, 345 Wis. 2d 832, 826 N.W.2d 418, a case cited by Nimmer in support of his argument. In *Pugh*, officers were patrolling an area where there was a vacant building known to be a drug house. *Id.*, ¶4. They observed the defendant when he was "five-to-ten feet from two cars that were parked below a no-parking sign" at the back of that vacant building. *Id.*, ¶3. The defendant admitted that one of the cars parked under the no-parking sign was his. *Id.*, ¶4. However, the officers did not give the defendant a citation related to the parking matter; instead, they asked him "if he had anything illegal on his person," based on the fact that the defendant had "bladed" his right side away from the officers. *Id.*, ¶6. The defendant admitted that he had a gun in his possession, and he was charged with being a felon in possession of a firearm. *Id.*, ¶¶1, 6. His motion to suppress the gun evidence was denied, and he pled guilty to the charge. *Id.*, ¶1.

¶20    This court reversed that decision. *Id.*, ¶13. In doing so, we noted that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.*, ¶12 (citation omitted; brackets in *Pugh*). Furthermore,

the officers who arrested Pugh had stated that he had bladed away from them when he took a couple steps back away from them. *Id.* We asked how a person walks away from another—as Pugh had the right to do at that point— without "turning his or her body to some degree," and stated that "[c]alling a movement that would accompany *any* walking away 'blading' adds nothing to the calculus except a false patina of objectivity." *Id.*

¶21 There is, however, a distinguishing factor between *Pugh*, as well as *Gordon*, and this case, along with *Lewis*: in this case and in *Lewis*, the officers were investigating a report of shots fired, where in *Pugh* and *Gordon*, the officers were simply on routine patrol in a "dangerous" area. In fact, the officers responding to a shots fired report was the key factor in the trial court's decision here: "anyone that they encountered within a minute or two of receiving the alert should have been investigated if they were within a couple of blocks of the alleged shots being fired." Further discussion of this distinguishing factor, therefore, is prudent for this analysis.

¶22 That leads us to *State v. Washington*, 2005 WI App 123, 284 Wis. 2d 456, 700 N.W.2d 305, also cited by Nimmer. In *Washington*, officers were "investigat[ing] a complaint of loitering and drug sales at an allegedly vacant house." *Id.*, ¶2. The officers saw the defendant in front of that house, and recognized him from previous encounters relating to narcotics sales. *Id.*, ¶¶2, 3. The officers ordered the defendant to stop; he did, but then backed up a few steps at which time a towel flew out of his hand which contained cocaine. *Id.*, ¶2. He was charged with possession of cocaine with intent to deliver. *Id.*

¶23 The officers claimed that they had initially stopped the defendant with the intent to charge him with loitering. *Id.*, ¶3. At a suppression motion hearing on

the issue, however, the trial court stated that no proof had been submitted that the loitering ordinance had been violated. *Id.*, ¶7. Nevertheless, the court ultimately found that although the officers did not have reasonable suspicion for the initial stop of the defendant, after he had "thrown the drugs away," the officers had probable cause to arrest him. *Id.*

¶24 This court reversed that decision, concluding that the drugs had been recovered as the result of an unreasonable stop and illegal seizure. *Id.*, ¶19. We stated that the officers did not have reasonable suspicion to initially stop the defendant, noting that there was nothing in the record to support the officer's statement that they were going to cite him for loitering. *Id.*, ¶17. We further concluded that even the defendant's known prior convictions for selling drugs and his location in front of a known drug house "[did] not supply the requisite reasonable suspicion for a valid investigatory stop." *Id.* Additionally, we noted that the defendant had not attempted to flee, even though he had taken a couple of steps backwards after being ordered by the officers to stop. *Id.*, ¶18.

¶25 From *Washington*, we take away the principle that when officers are investigating a specific crime, the mere presence of an individual in the area where that crime is suspected of having been committed—even if the individual is known to have previously committed a related crime—is still not sufficient to meet the reasonable suspicion standard. *See id.*, ¶17. In fact, we observed that "[p]eople, even convicted felons, have a right to walk down the street without being subjected to unjustified police stops." *Id.*

¶26 The common thread in all of these cases is that the facts articulated by the police officers involved were deemed to be insufficient to support a finding of reasonable suspicion. With that being said, we cannot help but wonder—even while

9

recognizing that police officers must make split-second decisions under circumstances where all factors may not be known—whether in response to these decisions, officers have sought to find "magic" language for their articulated facts to describe a person's behavior to overcome the problems identified in these decisions.

¶27 For example, we know from the cases discussed above that Nimmer's mere presence in an area where criminal activity is suspected is not sufficient to meet the standard for reasonable suspicion. *See id.*; *see also Pugh*, 345 Wis. 2d 832, ¶12. However, Officer Milone further testified that Nimmer also accelerated his walking pace upon seeing the squad. The officer explained that this may have been "an attempt to maybe run from police."

¶28 We are not swayed by this additional factor. Although we have previously recognized that "flight or attempted flight," together with other factors, may be sufficient to support a finding of reasonable suspicion, *see Gordon*, 353 Wis. 2d 468, ¶17, increasing one's walking pace is not the equivalent of fleeing the scene. *See Young*, 294 Wis. 2d 1, ¶73 (where our supreme court acknowledged that "people may have the right to disregard the police and walk away without giving rise to reasonable suspicion"). Furthermore, the indeterminate nature of the officer's testimony here is comparable to a "mere hunch," which is insufficient for finding reasonable suspicion. *See id.*, ¶21.

¶29 Additionally, we know that Nimmer's purported blading away from Officer Milone as he walked is likewise insufficient to support reasonable suspicion. *See Pugh*, 345 Wis. 2d 832, ¶12. However, Officer Milone testified that Nimmer was also "digging around" in his pockets as he walked. We know from *Gordon* that a "security adjustment"—in that case, touching the outside of a pants pocket—is

insufficient to demonstrate reasonable suspicion. *See id.*, 353 Wis. 2d 468, ¶¶4, 17. Similarly, we know from *Lewis* that "holding the waistband" of one's pants is also insufficient. *See id.*, 2017AP234-CR, ¶¶2, 8. Even knowing that weapons are often found in both pockets and in the waistband of pants—Nimmer's weapon was discovered in his waistband—we refused in both of those cases to presume that observing an individual's hand in either of those places is necessarily indicative of a "nefarious purpose[.]" *See id.*; *Gordon*, 353 Wis. 2d 468, ¶17. We decline to do it here as well, despite the added descriptor of "digging around" in his pocket.

¶30 Therefore, we conclude that, even taken together, these facts do not support a finding that the officers had reasonable suspicion to stop and frisk Nimmer. Furthermore, the standard employed by the trial court here—that anyone the officers encountered "within a minute or two of receiving the alert should have been investigated if they were within a couple of blocks of the alleged shots being fired"—is simply too broad to fit within the confines of Fourth Amendment law regarding stop and frisk procedures. Accordingly, we reverse the trial court's order denying Nimmer's motion to suppress, and remand this matter with instructions to enter an order granting his motion.

*By the Court.*—Judgment reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.